G. L. HENDERSON et al., Appellants, v. HELEN R.
HENDERSON et al., Defendants.

**Kansas City Court of Appeals, February 21, 1910.**

1. MARRIAGE: Legality of Contract: Mental Power to Contract: Question Raised Collaterally: Character of Evidence. While it may be possible that a court of equity might not deny relief in all cases where the question of the legality of a marriage because of mental incapacity is raised after the death of one of the contracting parties, it will not annul such a marriage in a contest over property where the evidence of want of capacity is not clear and cogent.

2. ————: ————: ————: ————: Fraud. In order to annul a marriage on account of fraud on the part of one of the parties to a marriage, the evidence must show that the fraud was so great as to result in the substitution of one will for the other. A marriage procured by fraud can be vacated only at the instance of the injured party.

Appeal from Jackson Circuit Court.—*Hon. E. E. Por-terfield,* Judge.

AFFIRMED.

*C. W. Prince* and *C. B. Adams* for appellant.

(1) Allowance to widow by probate court and affirmance thereof on appeal to circuit court were not *res adjudicata* on question of validity of marriage. Probate court has no equitable powers. Church v. McElhinney, 61 Mo. 543; Butler v. Lawson, 72 Mo. 227; Church v. Robertson, 71 Mo. 326; Conley v. Truitt, 63 Mo. App. 356; Johnson v. Jones, 47 Mo. App. 237; Burkhardt v. Helfrich, 77 Mo. 376; Ivie v. Ewing, 120 Mo. 523; Railroad v. Lowder, 138 Mo. 523; St. Louis v. Hollnah, 175 Mo. 85; In re Glover & Shepley, 127 Mo. 153; Patterson v. Barth, 103 Mo. 402; Brown v. Cole, 136 Mo. 201; Johnson v. Jones, *supra;* State v. Jones, 53 Mo. App. 207; Burkhardt v. Helfrich, 77 Mo. 376; Butler v. Lawson, 72 Mo. 227; Akes Appeal, 74 Pa. St.

116; Brian v. Fleming, 135 Mo. 597; Smith v. Gilmore, 13 Mo. App. 155; Smith v. Gilmore, *supra;* Rifle v. Land Co., 71 Mo. App. 617; Rick v. Downer, 72 Mo. App. 571; Zall v. Sceper, 75 Mo. 460; Merry v. Freeman, 44 Mo. 518; Wagner v. Queen, 67 Mo. App. 617; Cole Co. v. Stover, 56 Mo. App. 107. (2) A judgment of the probate court, affirmed on appeal to the district court is not a bar to an equitable proceeding respecting matters of which the former court had not equitable jurisdiction requisite to determine the facts and adjudge the relief to which the parties were entitled. Gordon v. Kennedy, 36 Ia. 167; Mayor. v. Tudor, 74 Tex. 47; Sweeney v. Warren, 127 N. Y. 426; Neilly v. Neilly, 89 N. Y. 352; Reese v. Murman, 5 Wash. 373; Golden v. Whiteside, 109 Mo. App. 519; Purdy v. Gault, 19 Mo. App. 191; Wonderling v. Lafayette Co., 150 Mo. 650; Stevens v. Fitzpatrick, 114 Mo. App. 497; Klent v. Winter, 23 Kan. 492. (3) A court of equity will entertain jurisdiction to annul a void marriage. Weightman v. Weightman, 4 Johns. Ch. —; Powell v. Powell, 18 Kan. 379; Waymire v. Jetmore, 22 Oh. St. 274. (4) Such a marriage may be annulled after the death of one or both of the parties. Pongree v. Tilden, 41 Vt. 46; Orchardson v. Caffield, 171 Ill. 14; Gathings v. Williams, 27 N. C. (5 Ired.) 487; Bishop, Marriage and Divorce (5 Ed.), sec. 105; Chapline v. Stone, 77 Mo. App. 579; Higgins v. Breen, 9 Mo. 497. (5) The test of mental capacity. Ward v. Dulaney, 23 Miss. 410; Chapline v. Stone, 77 Mo. App. 523; Crump v. Morgan, 38 N. C. (3 Ired. Eq.) 91; St. George v. Biddeford, 76 Me. 593; True v. Rannee, 21 N. H. 53; Browning v. Beane, 2 Phill. Eccles. Rep., 69; Cole v. Cole, 5 Sneed 57; Kern v. Kern, 51 N. J. Eq. 574; Smith v. Smith, 47 Miss. 211; Foster v. Means, 1 Speers Eq. 569; Middleborough v. Middleborough, 12 Mass. 364; Lewis v. Lewis, 44 Minn. 124; Concord v. Rumney, 45 N. H. 423; Ward v. Dulaney, 23 Miss. 410; Bishop on Mar. & Div., sec. 134 Portsmouth v. Portsmouth, 1

Hog. Ec. 355, Eng. Ec. 154; Browning v. Reame, 2 Phillim, 69 Eng. Ec. 190; Orchardson v. Schofield, 40 L. R..A. 265. (6) Where confidence is necessarily reposed by one in another, such relationship is a fiduciary one which invites the watchful and jealous care of a court of equity and renders any transaction between the parties thereto presumably invalid. Cadwallader v. West, 48 Mo. 483; Garvin v. Williams, 44 Mo. 465; Yosti v. Laughran, 49 Mo. 594; Maddox v. Maddox, 114 Mo. 35; Harvey v. Sullens, 46 Mo. 147; State v. Grass, 62 Mo. 226; Rankin v. Patton, 67 Mo. 221; Bridewell v. Swank, 84 Mo. 467; Gay v. Gillillian, 92 Mo. 250; Haglay v. Head, 126 Mo. 619; Lewis v. Lenhart, 127 Mo. 271; Carl v. Gabel, 120 Mo. 283; Lee v. Pearce, 68 N. C. 76; Dingman v. Romine, 141 Mo. 466. (7) The relationship existing between a nurse and an invalid is a fiduciary relationship. Bayliss v. Williams, 6 Cold. (Tenn.) 442; Willard, Eq. Juris., 503; Annot. notes to Hageman v. Basely, 4 My. & Cr. 277; 2 H. L. Cas. 750; Adams Eq. 185. (8) Where a settlement is made on the basis of representations which are fraudulent it may be set aside. Wonderling v. Lafayette Co., 150 Mo. 650; 14 Am. and Eng. Ency. Law, 69; Ruynall v. Sprye, 1 De Gax M. & G. 708; Hayes v. Delzell, 21 Mo. App. 679; Wainell v. Kem, 57 Mo. 492; Cottrell v. Krum, 100 Mo. 397; Judd v. Walker, 114 Mo. App. 140; Bigelow on Fraud, p. 528; Anthony v. Boyd, 15 R. I. 495; Jones v. Chappell, 20 Ky. (5 T. B. Mon.), 422; Converse v. Blumrich, 14 Mich. 109; Mosby v. Leeds, 3 Call (Va.) 439; Ross v. McLauchlan, 7 Grat. 86; Spahr v. Hollingshead, 51 Ky. (12 B. Mon.) 426; Adie v. Prudhomme, 16 La. An. 343; Peter v. Wright, 6 Ind. 183; Dyer v. Jessup, 11 Ia. 118. (9) Although the parties were married in Arkansas, they intended to live in Missouri, and their contract should be governed by the Missouri law. Bishop, Mar. & Div., sec. 404. (10) Even under Arkansas law the marriage was void. Sec. 4906, 4910, Ark. Stat.; Bishop, Marriage, Div. & Sep.,

sec. 634. (11) Admissibility of opinions of non-expert witnesses as to mental capacity. State v. Klinger, 46 Mo. 229; State v. Erb, 74 Mo. 205; Crowe v. Peters, 63 Mo. 434; Sharp v. Railroad, 114 Mo. 94; Farrell v. Brennan, 32 Mo. 328; Appleby v. Brock, 76 Mo. 314; Baughman v. Baughman, 32 Kan. 538; Stubbs v. Houston, 33 Ala. 555; Chickering v. Brooks, 61 Vt. 554; Foster v. Dickerson, 64 Vt. 233; Moore v. Moore, 67 Mo. 192; Clary v. Clary, 2 Ired. 78.

*Jos. S. Rust, T. A. Frank Jones* and *L. H. Waters* for respondents.

(1) The compromise of a doubtful claim is a good consideration for a contract. Reilley v. Choquette, 18 Mo. 226; Wood v. Tel. Co., 123 S. W. 15; Livingston v. Dugan, 20 Mo. 102; Dalkine v. Lume et al., 122 S. W. 776; 1 Parsons on Con. (6 Ed.), p. 438, sec. 4. (2) All who are present at and participate in a settlement and share in its proceeds are bound as to all matters included therein and are estopped from repudiating such settlement. Combs v. Sullivan Co., 105 Mo. 235. (3) The compromise was merged in the judgment of distribution. Crim v. Crim, 162 Mo. 544; Freeman on Judgs., secs. 215, 623; Townville v. Railroad, 148 Mo. 623. (4) The effect of an order of distribution by express statute is to settle the claims of the distributees. R. S. 1899, 244, 278, par. 4; Hadley v. Bernero, 103 Mo. App. 558; Cox v. Boyle, 152 Mo. 582; Tilly v. Menke, 126 Mo. 220; Ladd v. Stephens, 147 Mo. 320. (5) The order of distribution was a final judgment. State v. Babb, 77 Mo. App. 280; Freeland v. Wilson, 18 Mo. 380; Price v. R. E. Co., 101 Mo. 116. (6) If the judgment of distribution is ever attacked it must be for fraud in the very act of procuring it. Smith v. Hager, 150 Mo. 444; Hamilton v. McLean, 139 Mo. 685; Hamilton v. McLean, 169 Mo. 58-73. (7) An order of distribution may be read in evidence as an estoppel or in bar without being pleaded. Garton v. Botts, 73 Mo. 278.

(8)   The order of distribution stands as a judgment against them until a court of equity shall set it aside because obtained through fraud, in a direct proceeding brought for that purpose. Covington v. Chamblin, 156 Mo. 587; Burkharth v. Stephens, 117 Mo. App. 432. (9) Under the contract entered into between the parties, Mrs. Ressor had a right to request or demand that the doctor should comply with the contract, and could not be charged with undue influence had she done so. Cole v. Holliday, 4 Mo. App. 98; Broyhill v. Norton, 175 Mo. 199; Baldrick v. Garvey, 66 Iowa 14; Bank v. Sneed, 97 Tenn. 120.   (10)  A marriage celebrated in other States and countries if valid by the laws of the State or country where celebrated, is valid in this State. Bank v. Galbraith, 149 Mo. 536; Johnson v. Johnson, 30 Mo. 85; Story on Con. of Laws, secs. 114-119.   (11) Under the Arkansas statutes, 1894, section 4910, a marriage procured by fraud is voidable and it becomes void only from the time it is declared void by a proper court. Valleau v. Valleau, 6 Page 207; Gall v. Gall, 114 N. Y. 109, 120; Taylor v. Taylor, 71 N. Y. Sup. 413; Taylor v. Taylor, 65 N. E. 109; Charles v. Charles, 42 N. W. (Minn.) 935.   (12)  Where consent was given under duress the marriage is voidable. Willard v. Willard, 65 Tex. 297; Heneger v. Lomas, 44 N. E. (Ind.)  462. (13)  A marriage in contravention of a statute prohibiting marriage by an epileptic and providing a punishment is voidable and not void.  Gould v. Gould, 78 Conn. 242; Pearsoll v. Chapin, 44 Pa. St. 9; Mitchell v. Parker, 25 Mo. 34; Wiser v. Lockwood, 42 Vt. 720. (14)  A voidable marriage can only be inquired into by a direct proceeding between the parties and during their joint lives.  2 Nelson M. & S., page 534, sec. 569. (15)  Marriages are voidable, which are obtained with imperfect consent, as where there is fraud, error, duress or the party is incapable of giving consent from want of age or mental incapacity.  And they are good for every purpose until avoided.  2 Nelson M. & S.,

sec. 569; Clark v. Field, 13 Vt. 460; Schouler on Dom.
Rel., sec. 14; 1 Bishop M. & D., sec. 292; 19 Am. and
Eng. Ency., p. 1210; Jackson v. Jackson, 94 Cal. 446.
(16) The validity of the marriage was sustained by
a great preponderance of the credible evidence in the
case. Slois v. Slois, 9 Mo. App. 97; Elzey v. Elzey, 1
Houston (Del.) 319; 1 Bishop on Mar. & Div., sec.
599, 600; Payne v. Burdette, 84 Mo. App. 337.
(17) A contract made with a person of unsound mind,
but not under guardianship is only voidable; and if land
is purchased of such a person in good faith and no ad-
vantage has been taken, it will be upheld. Blount v.
Spratt, 113 Mo. 55; McKenzie v. Donnell, 151 Mo. 455-
458; Wells v. Benefit Assn., 126 Mo. 637; 1 Bishop on
M. & D., sec. 603; Hughes v. Rader, 183 Mo. 630. (18)
The most reasonable test is believed to be the ability
to understand the nature of the marriage contract and
not the ability to enter into ordinary contracts or to
make a will. 2 Nelson on Mar. & Div., sec. 658; Maddox
v. Maddox, 114 Mo. 42, 48; Knapp v. Trust Co., 199
Mo. 663; 1 Bishop on Mar. & Div., secs. 600, 601; Chap-
line v. Stone, 77 Mo. App. 531; Nash v. Hunt, 116 Mass.
237; Lawson Ex. Ev., 537. (19) If of unsound mind
at the time, one afterwards, during a lucid interval,
consented to the marriage, and lived with defendant
as his wife, the marriage could not thereafter be an-
nulled for mental incompetency. Gross v. Gross, 96
Mo. App. 489; Johnson v. Johnson, 45 Mo. 606; Busch
v. Busch, 81 Mo. App. 562. (20) The admissibility
of evidence of non-expert witnesses to show mental in-
capacity. 3 Rice Ev., sec. 21; State v. Soper, 148 Mo.
235; State v. Holloway, 156 Mo. 231; State v. William-
son, 106 Mo. 170; State v. Schafer, 56 Mo. App. 501;
Sharp v. Railroad, 114 Mo. 100; State v. Crish, 126
Mo. 608, 609; 2 Nelson Mar. & Div., sec. 658; Harnon
v. Harnon, 180 Mo. 698; Crowson v. Crowson, 172 Mo.
702; Crossan v. Crossan, 169 Mo. 631; Jackson v. Hard-

141 App.—35

ing, 83 Mo. 175; 2 Nelson M. & D., sec. 658; 1 Bishop
M. & D., sec. 589; 1 Bishop M. & D., sec. 601; John-
son v. Kahn, 97 Mo. App. 631; Epps v. State, 102 Ind.
539; State v. Hill, 93 Ala. 514; Schrodt v. St. Joseph,
109 Mo. App. 630; Buckalew v. Railroad, 107 Mo. App.
588; Hampton v. Massey, 53 Mo. App. 504; Spaulding
v. Edina, 122 Mo. App. 68; Campbell v. Railroad, 175
Mo. 178.

BROADDUS, P. J.—This is a suit to annul the
marriage of the defendant Helen Henderson to E. L.
Henderson, deceased, by his brothers and sisters, he
having had no descendants. John P. Tillhof, the exec-
utor, and The Corn Belt Bank are also made defend-
ants. The marriage was consummated August 10, 1906,
at Hot Springs, Arkansas.

The grounds upon which it is sought to annul the
marriage are, that the deceased was mentally incapable
of contracting marriage and that it was brought about
by the artful devices of the said Helen. The bank is
made a party to the proceedings for the reason that it
is a depository of some of the assets of the estate. An
injunction was sued out to restrain the bank and the
executor from transferring money and property in their
hands belonging to the estate, to their co-defendant.
Defendants filed a motion to dissolve the injunction
which was sustained and plaintiffs appealed.

It appears that deceased had been for a long time
an invalid and that prior to June, 1905, Mrs. Hender-
son, then Ressor, had been his nurse. At that date
he went to Europe but returned in August following.
Mrs. Henderson claims that before he started she and
he were engaged to be married, but that it was post-
poned on account of her own health. After his return
defendant continued to act as his nurse and accompan-
ied him in that capacity to Battle Creek, Michigan,
where they stayed only for a short time and then went
back to Kansas City. In October she went with him

to Hot Springs, Arkansas, in order that he might receive treatment for his disease. The two returned to Kansas City in the latter part of January, 1906. While in Hot Springs, there had been some improvement in his condition. In April, 1906, he made his will in which he devised to her $500, on account of her faithful services as his nurse. On June 6, 1906, they returned to Hot Springs and were married as stated in August following.

The witnesses differ materially as to the physical condition of the deceased, and much more so as to his mental state. Affirmatively J. O. Henderson one of deceased's brothers, stated that in July, 1906, his condition was "very bad;" that he was afflicted in various ways; that he was much emaciated; that his eyes, nose and ears were bad; that his throat and tongue were partially paralyzed; and that he walked infirmly. Continuing he stated, that the eyes were crossed—pointed inward; that he had necrosis of the nose with discharges and occasional discharge from the ears; that he "slobbered continually and the tongue was paralyzed—was thickened and his throat so paralyzed that he swallowed with difficulty—unable to take solid food at all." He described his mental state at that time as bad, that "He didn't have the power of words, thought or expression. His mind was weak, infirm, incapable of reasoning from cause to effect or from effect back to cause." That "his speech was very inarticulate and very difficult for him and his hearing was very defective. His talk was mostly in monosyllables—yes, or no."

During the time the witness was with the deceased he had some talk with defendant in reference to the propriety of having a man nurse, as much that she had to do in attending to the wants of her patient were not suitable to a female. She asked him, with a smile: "Do you think there had ever been any sexual relation between your brother and myself? . . . Such a

thing as that would be absolutely impossible. Your brother has neither the passion nor the ability to perform the sexual act."

The following letter of Mrs. Henderson was introduced in connection with the witness's testimony:

"Hot Springs, Arkansas, August 20, 1906.

"Dear Mr. Henderson: Dr. Ernest and I have just returned from Dr. Gebhart's office, where he informed us he had written you, and I presume Dr. G. L. some things that are true, other that are not. Dr. G's statement that Dr. E. and I were married on the 10th inst., is true, that we have had marriage relations, is untrue; for I know as well as Dr. Gebhart such act, or single act, would be fatal to Dr. Ernest's recovery and no one questions my efforts to build up Dr. Ernest's health. Any one who knows will always say how hard I have tried to strengthen him, and all the trouble I have taken to procure fresh eggs—am now getting them from five different families—and such things as he can eat, that his weak nauseous stomach might retain the little nourishment I could get him to take.

"As to our marriage, all I have to say is, I was his choice when he was well, and we were to be married last fall, and I can prove by reliable people, all my statements. But on account of his paralytic condition, and a few other things, on which we did not see alike, we decided to wait until Dr. E. was well, and should have done so, had not things been said which made us believe a change of nurses was contemplated. You know how easy Dr. E. is worried, and cries at times; and when he would say Oh! Helen, if it was not for you, I would not be alive today. Only promise me you will always stay with me, and care for me. Should we be separated, I know I would not last long, for there are so many, many nights I would not sleep if you were not so patient and kind. I know

there is no other who would sit and talk to me and comfort me as you do, when I become so discouraged. So to give him peace of mind, and the assurance that I would always love and care for him as tenderly as his dear old mother would, were she living, I married him. Not for wordly gain as was insinuated, but because I wanted him to become well in mind as well as body.

"Dr. Gebhart said tó Mrs. Dunkwater—the old woman we had rooms with when here last winter—that without a doubt, Dr. E. would in six or eight weeks be much improved. And I believe he will too, for he trusts and believes in God, and is hopeful of a recovery, which is no small item in a condition like his. And you know before he came to Hot Springs, he only thought of the last call man answers to. Presume from what Dr. G. said our marriage will not be pleasing to you, if such be the case, I beg of you for the brotherly love you have for Ernest, not to say or do any thing that will in any way disturb his mind. I care nothing for Dr. E.'s earthly possessions, and am willing to signify same in any legal way that may please you, and his brothers. All I ask is, for you to help me keep his mind at ease. I would rather see him dead than insane. I have done all I could to restore him, and as far as our marriage is concerned, it has, and will make no difference in our relationship of patient and nurse. There has never been an act between us, that would not be proper for mother and son. I cannot make my statement stronger. His helpless condition appeals to me so strongly, I feel I cannot do too much towards his recovery.

"If you have any unpleasant things to say, I beg of you say them to me without his knowledge. We can settle any thing and every thing without annoying him, as Dr. Gebhart did this a. m. I begged him almost on my knees not to quit the case, and say no more before Dr. Ernest, for no other doctor has ever even benefited him, and I know none so competent to handle

the case as Dr. G. Then when we returned home, I had to beg Dr. E. to let Dr. G. treat him. Dr. E. never liked Dr. G., and when Dr. G. said Ernest didn't know anything any how, it made Dr. E. angry, and he said "I'll show him I know enough to quit him any way." But I coaxed Dr. E. to continue with Dr. G., and Dr. G. came out this evening in his usual whistling way—which annoys Dr. E. so much.

"Now as to Dr. E's physical condition, his improvement was quite rapid from July 7th, until the day he stumbled, and got that shake up on the Terrace. It was July 18th, I believe. The day of your arrival, you know how he was the week you were here, vomited once or twice I believe. Well his condition has continued about the same, his stomach has been and is still bad; he cannot swallow solids, and the raw eggs make him bilious. Milk makes him vomit, so you see the difficulties one labors under. Then this past week, the weather has been so hot, warm don't express that. Every one, even in the shady spots, is half sick with the heat. And as a matter of course, Dr. E. feels and shows the result. You will remember Dr. E.'s temperature was 97 3-5 when he had no fever. Last Wednesday was the first day his temperature had been 97 3-5 since he had that little fall July 18th. Every act of my life since coming to Hot Springs has been with one view, namely: to strengthen and restore him to his normal condition. Dr. G. can say what he pleases about Dr. E. having sexual intercourse or desire, I know he is wrong. Such things never enter his mind. Dr. Ernest's thoughts are in different channels. His greatest pleasure is in having one of the young men missionary workers read and explain the healing chapters of the Bible, and Ernest now believes God will heal him. Dr. G. has found the Missionary here on several occasions, and this seemed to annoy Dr. G. as he is an unbeliever, and seems to take delight in saying unkind things about christian people. Oh! how

I wish you had talked to Ernest and I as you seem to have talked to Dr. G. How much annoyance and worry would have been spared all, especially dear Ernest.

"This is Sunday and I have just got this letter finished. Will have same copied and forwarded to all of the brothers.

"If I thought that a change of nurses was best for him there is no one who would say God bless him, and make the change more readily than I. But I know his temperament, what his stomach will tolerate, etc., better than any other can know. So I beg of you to consider him, "not your wish or me" in all you do. I do not want his money. I only want to care for him until he is well, and fulfill the promise I have always made him. If it were not for that promise, I would now be in Washington. But God's will, not mine be done."

"Sincerely yours,

"HELEN."

A witness, by the name of Wolcott, who was at the time living in separate apartments in the same house with deceased testified that about the time of the marriage deceased did not seem to have any control of his body or mind, and that he seemed to be helpless; and that he saw him often during a period of seven weeks while he was residing in the same building.

Numerous witnesses testified as to the condition of the deceased while he was at Hot Springs, just before and after the marriage. Without exception they corroborated the evidence of J. O. Henderson, both as to the condition of his mind and body. Their opportunities were favorable as they saw him frequently and some of them daily. The testimony of each was to the effect, the deceased was almost entirely helpless; that when asked a question he was either unable to hear or to understand what was said to him; and that he was unable to make any intelligent response. Many per-

sons also testified as to his condition in Kansas City where he returned after his marriage.

Dr. Tureman, a specialist, treated deceased in April, 1906, at Kansas City. He testified that: "His general condition was that of a man unable to act for himself, with physical faculties and mental faculties greatly impaired. He was deaf, cross-eyed, unable to speak intelligibly or articulate perfectly, unable to comprehend ideas or to answer questions intelligibly, unable to act for himself." That he treated him only for ulceration and necrosis of the nasal tissue with discharge from the nose and throat.

On the other hand there is much evidence tending to show that just prior to, at, and a short time after the marriage the condition of the deceased physically and mentally was better than it had been previously. Dr. Gebhardt testified as follows:

"I am a physician, and have been practicing medicine since 1876; I attended a medical college with Dr. E. L. Henderson, and afterwards met him at Hot Springs, in said county and state, where affiant has been engaged in the practice of medicine for the past five years. He was a patient of mine at Hot Springs on two occasions when he visited the Springs, the last visit was made when he was married to Mrs. Helen Ressor, the other the year perhaps before, after he came to the Springs, the last time that is the time he was married, he got better under my treatment and could go around by himself. He came to my office, which is on the second floor, frequently, sometimes every day, and on one or two occasions alone; at all other times his nurse was with him. He came to my office for treatment before he was married and after he was married.

"When Dr. Henderson came to the Springs, on his last visit there, I found he was a slow thinker, co-ordination was bad, for a month before he was married he could sit up and walk around and talk intelligently. He had sufficient mind to know what he was doing. For

a period of a month before he was married and a month after, I watched him closely. He could read and write, and affiant has seen him sitting on the porch reading. He was, during all that time, a sane man. His wife had no more influence over him than affiant's wife had over affiant. Once after their marriage, Dr. Henderson went from my office to his house alone on the street cars. At times, when they called at my office, he would come in alone, while his wife remained in the outer office.

"Before their marriage, and while they were at Hot Springs the last time, the Doctor said to me that he was devotedly attached to Mrs. Helen Ressor, and that he expected to marry her. For a month before and a month after his marriage he was a sane man. There is no question about that. Genito-urinary dis-eases are so closely blended with diseases of the brain and nervous system that I am compelled to study both."

Henry J. Olsen testified as follows:

"That he is a minister of the gospel and at present is pastor of the I. A. H. church in said city. That from sometime in June, 1906, until the latter part of September, 1906, he resided in the City of Hot Springs, Garland county, Arkansas, and that soon after going to that place he became acquainted with Dr. E. L. Henderson of Kansas City, Missouri, and Mrs. Helen R. Ressor. That from the time I became acquainted with them until August 10, 1906, Mrs. Ressor was a nurse and constant attendant upon Dr. Henderson who was an invalid. That I knew Dr. Henderson both before and after August 10, 1906, and saw and conversed with him every few days during that time. That the doctor during all that time was an invalid. That he was able to be up and around the house and to walk out upon the streets. That his mind during the time I knew him was clear and his conversation was connected and rational except a few times when the medicine given by physician dulled his sensibilities. That I was present

at the marriage of Dr. E. L. Henderson and Helen R. Ressor on August 10, 1906, at said city of Hot Springs, Arkansas. The marriage ceremony was performed by Rev. Lewis Powell, a Methodist minister. There were present at the marriage Mr. Drake, Mrs. Drinkwater, Rev. Mr. Powell, Mr. Watson, Mr. Adams, myself and perhaps others. The parties were standing during the marriage ceremony and the doctor's mind during the time was perfectly clear and in my judgment he was sane. He answered all questions asked him by the minister in an intelligent and rational manner and he understood perfectly that he and Mrs. Ressor were being married. All present offered them their congratulations. I did not have and do not now have a doubt as to Dr. Henderson's sanity at the time of his marriage. I frequently saw the Dr. and his wife after their marriage. He spoke of her as his wife and was evidently greatly attached to her."

The evidence of I. N. Watson, is to the same effect:

"My name is I. N. Watson. During the summer and fall of 1906, I resided in Hot Springs, Arkansas, and was engaged in mission work.

"Sometime in the early part of July, 1906, I became acquainted with Dr. Ernest L. Henderson and Mrs. Helen R. Ressor, his nurse. I was at their place of residence several times before August 10th, 1906, and on every occasion conversed with Doctor Henderson. On or about the 10th day of August, 1906, Doctor Henderson informed me that he and Mrs. Ressor were going to marry and requested me to secure a marriage license authorizing the marriage. I called on the clerk, gave him the names of the parties to be married, and gave the doctor's age as 38 and Mrs. Ressor's as 35. After filling out the papers the clerk informed me that the doctor must sign the application. Upon my telling the clerk that the doctor was not able to walk to the court house, as the weather was quite warm the clerk kindly went to the doctor's place of residence.

"At the doctor's request I had Rev. Louis Powell (a minister of the M. E. Church, South) come to the doctor's place of residence, and Brother Powell, in the presence of Mrs. Drinkwater, Mrs. Drake, Mr. Olsen and Mr. Adams, and perhaps others, performed the marriage ceremony. During the ceremony Doctor Henderson was dressed and stood by his wife without assistance and after the ceremony he sat down in a chair and (I cannot say how long he occupied chair at this time) talked with Brother Powell about Kansas City and its rapid growth and future prospects; about Hot Springs, and upon other topics. (I do not remember this conversation).

"After the marriage I called on them frequently and I never called that I did not have more or less conversation with Doctor Henderson. His conversation before the marriage, at the marriage and on each occasion after the marriage, was connected, intelligent and perfectly rational.

"After the marriage he always spoke of Mrs. Henderson as his wife. At their marriage he answered the questions propounded by Brother Powell correctly and intelligently.

"At the conclusion of the ceremony I remember the doctor kissed the bride and he and Mrs. Henderson were congratulated by all present.

"During all the time that I knew Doctor Henderson he was a sane man and at the time of his marriage he knew what he was doing, and while a great invalid, his mind was always clear and sane.

"My present residence is Coffeyville, Kansas."

The plaintiff J. O. Henderson whose evidence has been alluded to, in which he pictured the deplorable condition of his brother in July, 1906, on October following among other things wrote to deceased that: "The day I left Hot Springs, you had made marvelous improvement over what you were when I arrived. You certainly have good recuperative powers, which is the

best hope of recovery of all. I do hope and expect you to be able to write your own letters soon."

The evidence of the Methodist pastor, who performed the marriage ceremony was introduced. At that time he was pastor of a church at Hot Springs. He testified that on that occasion he was with the parties about one hour and a half and engaged in conversation with them and that he gave his special attention to the couple he had married. He was asked: "Please state Dr. Powell whether you had any conversation with Dr. Henderson, the groom, and if so, on what subjects did you and he converse? A. Why, yes, sir. I talked with Dr. Henderson. I talked with him, about Kansas City, about its growth and development, about his profession, and incidentally I made some observations on his health, because I knew that he was there for the purpose of recuperating and recovering his health—and about how long he had been indisposed. We discussed also municipal affairs, and compared conditions at Hot Springs with Kansas City. I think also, that we talked about religion, churches, yes, I am sure of that now, and if I am not mistaken he told me that his family were Episcopalians, and that his sympathies and affiliations were with that church—I know the matter was discussed; and that he at that time was interested in the matter of faith healing. These ministers that were present with me that day at the ceremony advocated the theory of faith healing, and Dr. Henderson wanted to know what I thought about it, and we talked along that line for some little bit.

"Q. Please state whether or not the conversation you had with him on that occasion, his part of the conversation was rational or irrational. A. Rational, I saw nothing indicating any mental disturbance.

"Q. From what you saw of him on that occasion, and the conversation you had with him on that occasion, please state if you can, what was the then condition of his mind, Dr. Powell? A. I should judge

from my interview with him, and from all the indications on that occasion that he was of clear mind, thoroughly cognizant and appreciative of all that was transpiring. I never had any occasion to call that matter in question on that day. That is the only time I saw him.

"Q. Doctor, after the marriage ceremony was performed by you, please state if you recall anything he immediately after its performance did or said? A. No, I don't recall anything, only he handed me a fee, and after I pronounced them man and wife, he turned with a bright face and mischievously kissed her; that is about all that I remember—only that he told me that this lady had been his nurse and he just concluded that she was such a good nurse he would just engage her for all time."

There is much other evidence tending to show that deceased had sufficient mental capacity to contract marriage. It is however useless to go into further details for the issue is not to be determined upon the preponderance or the bulk of the evidence but upon its nature, the character of the witnesses, their intelligence, their opportunities and impartiality.

It must be conceded at the beginning that the evidence discloses that deceased was sorely afflicted, before, at, and after, his marriage; and that he had been so for a long time. And we think that it must also be conceded that his mind had been impaired by reason of the disease or diseases with which he was afflicted.

The most intelligent witnesses who testified for plaintiffs were J. O. Henderson, a brother and a party plaintiff, and Dr. Tureman. According to their statements the deceased was both a physical and mental wreck. That his condition was so deplorable that he was incapable of helping himself in the most simple matters and mentally unconscious of appreciating his condition. But in passing upon the effect of Henderson's evidence we must also take into consideration

that he was an interested witness, and also the further fact that subsequently he wrote the letter, referred to, in which he complimented his brother on the improvement of his condition. The letter itself was a recognition that deceased had sufficient capacity to know and understand the matters to which it related. And it is evident that there had been a marked improvement in the health of deceased between the time Dr. Tureman treated him and the date of the marriage. And we are not persuaded that the numerous witnesses who spoke of his condition at Hot Springs, were persons who were very capable of passing upon the question of the deceased's mental condition. It is true they could see as well perhaps as others the indications of his physical affliction as they must have been patent to the most casual observer. But it appears that they were in the main uninformed people who would naturally from external appearance of deceased form a superficial opinion of the state of his mind.

On the other hand we have the evidence of persons whose judgment and opinions are of much weight. Dr. Gebhardt who was his physician was of the opinion that deceased had sufficient mind to know what he was doing; that he could read and write and was a sane man. The pastor, who officiated at the marriage ceremony, was a man of intelligence and impartiality and made such a statement of what occurred which if true shows that deceased was of sound and disposing mind at the time. And there is nothing that we have seen that tends to discredit his veracity. Besides he is supported by all the others present, save and excepting Mrs. Drinkwater.

It is true that deceased at times suffered great mental depression and often appeared, if not really so, to be an imbecile. But however that may be there was certainly an improvement in his condition, as plaintiff J. O. Henderson acknowledged in his letter, just before the marriage, and that at the time of the marriage he

was sufficiently recovered to know and understand what he was doing. And whatever may have been the condition of his mind at other times, its condition at the time of the marriage itself must govern the question of his capacity to enter into a marriage contract. If the testimony of intelligent and reputable witnesses, who were present at the time, is to be believed, the conclusion is irresistible that deceased was in a sane condition of mind.

If we are wrong in our conclusion as to the weight of the most credible evidence, it must be conceded that there is such a conflict in that respect, that it cannot be said that that of plaintiffs perceptibly overbalances or outweighs that of defendant. In order to authorize a decree, at this late day, after the death of one of the parties, annulling the marriage on the ground of want of capacity of the deceased, such want of capacity should be shown by evidence clear and cogent, as a court of equity in such a case will not weigh the pros and cons in order to determine to a nicety which way the scales preponderate. There is something more at stake than an ordinary contest over the rights of property. Figuratively speaking it is a resurrection of the dead and demanding the severance of a tie he contracted in the flesh. The infirmities of his mind, and the afflictions of his body and the inmost secrets of his private life are laid bare to public scrutiny. See Vol. 126 S. W., p. 208.

We do not want to be understood as entertaining the opinion that the remedy should be denied in all instances for we can well understand that the circumstances may be such as would demand the intervention of a court of equity, where to withhold its aid would effectuate a grievous wrong. But this is not a case of that kind, at best it is but a struggle for property.

It must be conceded that owing to the afflictions

of the deceased his mind had deteriorated, and that he had lost much of his mental vigor and that he was a proper subject to be influenced by those in his confidence. There is testimony in the case which tends to show that his nurse, owing to the confidential relation existing between them, had more influence over his action than any other person; and there is evidence we think tending to show that the marriage was to a great extent the result of such influence. His gratitude to her for her slavish administration of services, and her, to say the least, apparent solicitude for his welfare had much to do with the result. His language to the pastor at the marriage, that she was so good a nurse that he had married her to have her always, proves this. But there is other evidence tending to show that she was jealous of the attendance of others and would not consent to have a male nurse to do things that were wholly unsuitable to a female. And there is scarcely a conceivable motive for her wanting to marry her patient, who according to her own statements was an impotent, incurable subject, incapable of filling the role of a husband in that respect, unless it was for the purpose of inheriting his property at his death. Other circumstances indicate that her solicitations had much to do with consummating the marriage.

But admitting for the sake of argument that she influenced the mind of the deceased to consent to the marriage, and that her purpose was to inherit his estate at his death, does such a showing constitute such a fraud as would invalidate the marriage? The consequences of an answer in the affirmative would be far reaching in its effect, and dangerous likewise as can be seen at a glance. It would not be good policy to inquire too closely into the motives that induce men and women to marry, and the relative strength of mind of the parties, and of the influence the stronger might have brought to bear upon the weaker to bring marriage about. As far as a court would be justified in

going would be limited to the question, was the superior influence such as to substitute the will of the one for the other?

Giving the evidence its full effect we believe that there was nothing fraudulent in the conduct of the nurse. Her purpose, if it was to get the property of her patient, was not of itself evidence of fraud unless it be coupled with the further fact that the will of the deceased was subjugated by her importunities to consent to marriage. Conceding the marriage was brought about by the fraud of defendant the plaintiffs are without remedy. The marriage would not be void but voidable only. Voidable marriages can only be annulled at the instance of the injured party. [Bishop on Marriage and Divorce, vol. 1, sec. 292.] The judgment is affirmed. All concur.