G. L. HENDERSON et al., Appellants, v. HELEN R. RESSOR, or HELEN R. HENDERSON, et al.

**In Banc, July 12, 1915.**

1. **APPEAL: Abstract: Error of Printer.** Where the defects in the abstract, such as its failure to show any entries in the record proper that the motion for a new trial was filed or overruled or that the bill of exceptions was ever filed, are due to an omission by the printer of certain pages by accident, a motion to dismiss the appeal will be overruled, if appellants prior to the day the case is set down for argument ask leave to file a supplemental abstract supplying the omissions and accompanying such application by such supplemental abstract, and if respondents are in nowise hurt by the amendment.

2. **MARRIAGE: Annulment: Voidable: Collateral Attack: By Kindred.** Under the statute of Arkansas providing that a marriage may be annulled for incapacity, fraud or coercion, and that it "shall be void from the time its nullity shall be declared by a court of competent jurisdiction," marriage solemnized in that State is only voidable, and cannot be collateraly attacked after the death of one of the spouses, and the kindred of the deceased spouse cannot maintain a suit to have it annulled.

   *Held*, by WOODSON, C. J., that, if the contract of marriage is personal to neither of the contracting parties, the heirs of the deceased spouse have the same right to contest a voidable marriage that they do to contest a void marriage; that the subject-matter of a suit to dissolve a marriage, the *res*, is the marital relation itself, which is always dissolved by death, and the parties to a marriage contract are the spouses; and one of the parties being dead and the relation dissolved by death, with no suit having been previously brought by either, the kindred of the deceased, whose only interest in the matter is to obtain possession of the property which the law, as a pure incident of the marriage relation continued in amity till death, gives to the survivor, cannot maintain a suit to have that relation annulled.

*Held*, by WALKER, J., dissenting, that the statute of Arkansas, which declares that whenever a party shall, from want of understanding, be incapable of consenting to a marriage, the same "shall be void from the time its nullity shall be declared by a court of competent jurisdiction," makes possible an annulment of the marriage only by a direct proceeding between the spouses and during the lives of both, and therefore its operative effect is to declare a marriage void in substance simply voidable as to procedure; and this court should not be governed by such a law, which if it does not involve an absurdity, at least contains a contradiction.

3. ———: ———: **Divorce: Distinction.** The distinction between an action for divorce from the bonds of a valid marriage and an action in a court of equity to annul a void or voidable marriage is that an action to annul largely follows the ancient jurisdiction of equity and lies for causes existing at or before the marriage, while an action for divorce lies for causes which have arisen since the marriage, or for causes of which (though existing at the time of the marriage) the party seeking annulment was ignorant.

4. ———: ———: **Lex Loci Governs.** Unless a marriage contract is voidable under the laws of the State in which contracted, or unless the marriage (valid where celebrated) violates some distinctive local policy, such as the laws against incest, polygamy or miscegenation, it will not be voidable in the State of the spouses' domicile.

*Held*, by WALKER, J., dissenting, that the rule that a marriage valid where made is valid everywhere has no application to the question of the matrimonial capacity of the parties, which is to be determined by the domiciliary law of the parties at the time the right of action accrued, but is properly applicable only as to matters affecting the manner and mode of the solemnization of a marriage and the preliminaries thereof.

5. ———: ———: **Weight of Evidence: Deference to Chancellor.** A suit to annul a marriage being of equity jurisdiction, the appellate court tries it *de novo* and may reach a finding contrary to that of the chancellor below; but where the evidence is so evenly balanced as to leave the appellate court in doubt as to where the superior weight of credibility lies, it will defer to the finding of the trial chancellor.

6. ———: ———: **Contest for Property.** Where the suit brought by surviving kindred to have the marriage of the deceased husband annulled on the ground of his mental incapacity or on the ground that it was the outgrowth of fraud, is but a contest for property, and the evidence is evenly balanced, the finding should be in favor of the validity of the marriage.

Appeal from Jackson Circuit Court.—*Hon. Thomas J. Seehorn*, Judge.

AFFIRMED.

*C. W. Prince* and *T. A. Witten* for appellants.

(1) A judgment entered by agreement of parties where the agreement is procured by fraud, misrepresentation or concealment of the facts by one of the parties, can be set aside by proper proceeding in a court of equity, for that purpose. State ex rel. v. Engleman, 86 Mo. 563; Golden v. Whiteside, 109 Mo. App. 579; Trefz v. Ins. Co., 8 Fed. 177; Marine Ins. Co. v. Haden, 7 Cranch, 336. (2) Where one of the parties to a marriage contract was mentally incapable of contracting, the marriage is void and not voidable, and can be judicially declared null and void after the death of one of the parties. This is true in Arkansas, under proper construction of sections 4906 and 4910 of the Revised Statutes of Arkansas. Bishop on Marriage and Divorce, 634-37-38. The cases cited by counsel for defendant, on this point and relied upon by them, namely, Valleau v. Valleau, 6 N. Y. 207; Gall v. Gall, 114 N. Y. 413; Taylor v. Taylor, 71 N. Y. Supp. 413, are not in point, because they construe a statute of New York providing that certain marriages are "void only from the time their nullity is declared by a court of competent jurisdiction." The word "only" is not in the Arkansas statute, which is otherwise the same as the New York statute. Pingree v. Tilden, 41 Vt. 46; Orchardson v. Caffield, 171 Ill. 14; Gallings v. Williams, 27 N. C. (Ired.) 487; Chapin v. Stone, 77 Mo. App. 529; Higgens v. Breen, 9 Mo. 497. (3) Notwithstanding a marriage is absolutely void, a decree judicially declaring it so is necessary out of consideration of property rights and the future status of other parties and social good order. Weightman v. Weight-

man, 4 Johns. Ch. ——; Powell v. Powell, 18 Kan. 379; Waymeyer v. Jetmore, 222 Ohio St. 274.

*Joseph S. Rust* and *L. H. Waters* for respondents.

(1) The marriage was a valid marriage. Whatever may have been the condition of his mind at other times, its condition at the time of the marriage itself must govern the question of his capacity to enter into a marriage contract. If the testimony of intelligent and reputable witnesses who were present at the time is to be believed, the conclusion is irresistible that deceased was in a sane condition of mind. Henderson v. Henderson, 141 Mo. App. 559. They were engaged to marry as early as January 1, 1905; when he gave her the engagement ring engraved "E. to H., January 1, 1905," and she could not be charged with fraud or undue influence if she had required the doctor to keep his engagement. Cole v. Holliday, 4 Mo. App. 98; Brayhill v. Norton, 175 Mo. 199; Baldrick v. Garoly, 66 Iowa, 14; Bank v. Sneed, 97 Tenn. 120. The question in a marriage is whether the alleged insane person acted rationally regarding the particular marriage in dispute. Not whether it was wise, but whether it proceeded from a mind sane as respects the thing done. 1 Bishop on M. & D., sec. 600. A contract made with a person of unsound mind but not under guardianship is only voidable; and if land is purchased of such a person in good faith and no advantage has been taken, it will be upheld. Blount v. Spratt, 113 Mo. 55; McKenzie v. Donnell, 151 Mo. 455; Wells v. Benefit Assn., 126 Mo. 637. The most reasonable test is believed to be, the ability to understand the nature of the marriage contract and not the ability to enter into ordinary contracts or to make a will. 2 Nelson on Mar. & Div., sec. 658; Maddox v. Maddox, 114 Mo. 48; Knapp v. Trust Co., 199 Mo. 663; 1 Bishop on Mar. & Div.,

265Mo.46

secs. 600-1. Incoherence of thought has reference to the ideas expressed or conveyed to the hearer, rather than to the condition of the mind of the speaker. Nash v. Hunt, 116 Mass. 237; Lawson, Ex. Ev., 537. If of unsound mind at the time, but afterwards, during a lucid interval, consented to the marriage, and lived with defendant as his wife, the marriage could not thereafter be annulled for mental incompetency. Gross v. Gross, 96 Mo. App. 489; Johnson v. Johnson, 45 Mo. 606; Busch v. Busch, 81 Mo. App. 562. (2) If Dr. Henderson was incapable of consenting to the marriage for want of understanding, then the marriage was a voidable marriage under the Arkansas statute, and if voidable it could only have been annulled in the lifetime of the parties. It is a principle of international law that a marriage celebrated in other States and countries if valid by the laws of the State or country where celebrated, is valid in this State, even though the same might, by the force of our laws, be invalid if contracted here. Bank v. Galbraith, 149 Mo. 537; Johnson v. Johnson, 30 Mo. 85; Story on Con. of Laws, secs. 114-119. In this State, but two classes of marriage are declared void by statute. Under section 4312, marriage between certain persons on account of their relationship, and under section 4313, where either of the parties has a former wife or husband living. R. S. 1899, secs. 4312-4313. Where consent was given under duress the marriage is voidable. Willard v. Willard, 65 Tex. 297; Heneger v. Lomas, 44 N. E. (Ind.) 462; Gould v. Gould, 78 Conn. 242. Marriages are voidable, which are obtained with imperfect consent, as where there is fraud, error, duress or the party is incapable of giving consent from want of age or mental capacity. And they are good for every purpose until avoided. 2 Nelson M. & D., sec. 569; Clark v. Field, 13 Vt. 460. A voidable marriage can only be inquired into by a direct proceeding between the parties and during their joint lives. 2 Nelson

M. & D., p. 534, sec. 569; Wiser v. Lockwood, 42 Vt. 720.

FARIS, J.—Action in equity, brought in the Jackson Circuit Court by the kin and collateral heirs of one Ernest L. Henderson, deceased, to annul, on the ground of mental incapacity, the marriage of deceased to defendant Helen R. Henderson, and for other incidental relief. Plaintiffs being cast below have appealed.

Defendant Tillhoff is sued in his representative capacity as the executor of the last will of the deceased, and because he refused to join in the action as a party plaintiff. The Corn Belt Bank is made defendant because, as it is averred, it has in its custody as bailee for defendant Helen R. Henderson, certain notes and securities delivered to her by virtue of a former settlement mutually made between the adversary parties herein. Among the incidental matters referred to above may be mentioned a temporary injunction, which was sued out with a view of preserving the *status quo,* but which upon the trial of a motion to that end, was dissolved. From this judgment of dissolution, plaintiffs appealed to the Kansas City Court of Appeals, where the judgment below was in all things affirmed. [Henderson v. Henderson, 141 Mo. App. 540.] With the exception apparently of some testimony in rebuttal which cannot be said to disturb materially the balances of credibility on either side, the motion to dissolve the injunction was tried on the identical evidence on which the instant case was tried. In fact the instant case, so far as we can gather from a very unsatisfactory record, seems to have been largely but a trying over again of the case of Henderson v. Henderson, supra. Be this as may be, the facts there are in all material respects the facts here. Those who desire may read them there; we do not deem it necessary to again burden the books with them.

Many questions of estoppel were urged in defense by Helen R. Henderson, the principal defendant, arising, it is alleged, out of orders for allowances made and judgments of distribution solemnly entered by the probate court of Jackson county and not appealed from; but since the main controversy here is waged about the question of whether Ernest L. Henderson was sane or insane, mentally capable or an imbecile from the ravages of disease, when he married defendant Helen, and since this is the only thing decided by the court *nisi*, from which this appeal is taken, we may treat it as the court below treated it. In this phase the court below found thus:

"The court being fully advised of and concerning the premises finds the issues for the defendants and further finds that Ernest L. Henderson, at the time he and Helen R. Ressor were married, was sane, and that said marriage was a valid marriage."

And thereupon the court *nisi* simply adjudged upon the above finding that plaintiffs take nothing by their action and that defendants go hence. The above is the only finding and judgment before us in this case.

Both said Ernest L. Henderson, the deceased, and Mrs. Helen R. Ressor, then a widow, were domiciled in Kansas City prior to the first day of June, 1906. About this time deceased, who was suffering from bulbar paralysis, went for the benefit of his health to Hot Springs, Arkansas, accompanied by defendant Helen R. Ressor, who went as his nurse. Mrs. Ressor says, and in this she is corroborated by at least two other witnesses, that she had become engaged to marry deceased about January, 1905, and that the marriage between them was to have occurred prior to a trip which deceased made to Europe in June, 1905, but that her illness at that time caused a postponement of the marriage. When deceased returned from Europe in August, 1905, he was ill and was forced to go to a

sanitarium at Battle Creek, Michigan. Following an attack of pneumonia, in which defendant Mrs. Ressor nursed him, the engagement was temporarily broken, but again renewed, Mrs. Ressor tells us, prior to the visit to Hot Springs in June, 1906. While at Hot Springs deceased was, as we forecast above, cared for and nursed by Mrs. Ressor till August 10, 1906, when a marriage ceremony was duly and legally—confessedly so far as the outward forms of law are concerned—performed between them. After this marriage two of the brothers of deceased, J. O. Henderson and G. L. Henderson, who are plaintiffs here, visited him and defendant Helen at Hot Springs, while they resided together outwardly as spouses. Letters written to him afterwards by these brothers expressed surprise at his favorable prognosis and one of them referred to his "marvelous improvement." Nevertheless, practically all of the witnesses agree in saying that from the time he went to Hot Springs in June till he left there some time in December, 1906, his physical condition was deplorable and repulsive. He and defendant Helen returned to Kansas City about January, 1907, and lived there together, apparently at least as husband and wife, till he died in June, 1907. Helen Henderson says there was sexual consummation of the marriage some ten days after its celebration, but her letters shortly after the marriage ceremony say that in deceased's then physical condition sexual consummation was impossible, and that even if possible, his physical condition regarded, it would have been dangerous.

Toward the sole issue here, viz: the mental capacity of deceased to validly make and enter into a marriage, said by our Missouri statute to be "a civil contract" (Section 8279, R. S. 1909), practically the whole substance of the several witnesses' pertinent testimony was directed. The whole substance of this testimony is fairly set out in the case of Henderson v.

Henderson, 141 Mo. App. 540, to which reference for further facts is hereby made.

### OPINION.

I.   Three points deserve our attention.   One of these which has to do with the sufficiency of the abstract is raised by the respondents.  Specifically, this point is that the abstract filed is insufficient in that it fails to show by any entries contained in the record proper that the motion for a new trial was either filed or overruled, or that the bill of exceptions was ever filed.   In the abstract originally filed here these defects enured.  But afterwards and prior to the day on which the case was set down for argument in Division Two, but after joinder in error, appellants asked, by formal motion, leave to file a supplemental abstract (which abstract was lodged here with the motion) in which the defects complained of were cured. This motion was accompanied by an affidavit of the printer to the effect that certain pages of the abstract were by accident omitted when the printed abstract was being assembled for binding.   The facts presented being in a sense novel, inasmuch as amendments of abstracts after joinder in error are forbidden by our rules, we took this motion with the case.

The affidavit of the printer is corroborated apparently by the patent physical fact that there are three blank pages where the omitted entries ought to be and from further fact that in the paging of the abstract before us there occurs at the same place with' the blank pages an hiatus of eleven pages.   In short, the page preceding the first blank page is numbered 63 and the page following the last blank page is numbered 75.   From these facts it will be seen that appellants are not in default except in so far as lack of diligence may be argued from their failure to note the defect of omission in the abstract till this defect was

*Abstract.*

called to their attention by respondents' motion to dismiss the appeal. This they explain by the suggestion that the record is very voluminous, containing as it does 990 closely printed pages, and that the time to serve it under our rules had about elapsed when it came from the printer, and so in the hurry the fact of the omission of certain pages was overlooked.

The complaint is based upon the strict letter of our rule number 4, and is highly technical; the omission had been corrected before our hearing of the case and the argument thereof; respondents are in no wise hurt, and so we do not think we should put the appellants out of court upon a technicality so bald and meritless as that presented by respondents' motion to dismiss. We will overrule the request for a dismissal of the appeal and permit appellants to formally file their supplemental abstract heretofore lodged in the cause with our clerk.

II. Many contentions pro and con are made touching whether appellants, whom we may for clarity call plaintiffs, may maintain this action at all under the peculiar facts of this case. There is no very strenuous contention made by defendants that an action may not be brought at all after the death of one spouse to annul the marriage contract on account of lack of mental capacity of the deceased spouse to enter into a marriage contract. The point of the contention made is, that if we grant that such an action can ordinarily be brought (and that it will lie defendants practically concede), it cannot be brought in this case on account of the provisions of a statute of the State of Arkansas, the place of contract, which statute was offered upon the trial and which it is urged serves to make this marriage voidable only, and that being voidable and not absolutely void, an action cannot be maintained by the heirs of the deceased spouse. In other words, the contention is that a mar-

*Marriage: Collateral Attack.*

riage contract which is voidable only and not void cannot be attacked collaterally after the death of one of the parties to it. This statute reads as follows:

"Sec. 5175. When either of the parties to a marriage shall be incapable, from want of age or understanding, of consenting to any marriage, or shall be incapable from physical causes of entering into the marriage state, or where the consent of either party shall have been obtained by force or fraud, the marriage shall be void from the time its nullity shall be declared by a court of competent jurisdiction." [Kirby's 1904 Dig. of Ark. statutes of 1904.]

We cannot find that his statute has ever been construed by the Arkansas courts. Similar statutes in all material respects have been very seriously criticised by Mr. Bishop in his excellent work on Marriage, Divorce and Separation. That there is palpably much lack of art in the drawing of this statute must be conceded, and that it states a truism and a thing a layman would know, goes without saying; but that its meaning is fairly apparent and that its intention is to a marked degree salutary likewise goes without saying. To our minds it means that the courts and not the individuals affected must in all cases be allowed to sit in judgment upon the question of the existence of nonage, or mental incapacity, or impotence, or fraud, or duress to an extent which will furnish sufficient cause for annulment. Its effect is to render the marriage of persons under the age of consent, or the marriage of the mentally incapable, as also marriages contracted by fraud or force, voidable only. And being so voidable and not void, legally vulnerable to attacks made in the lifetime of the spouses only. This proposition is concisely stated in 2 Nelson on Divorce and Separation, section 569, where it is said:

"A voidable marriage can only be inquired into by a direct proceeding between the parties and during the lives of both of them. Until it is set aside it is

practically valid for all purposes; but when set aside the decree renders it void from the beginning. Marriages are voidable which are obtained with imperfect consent, as where there is fraud, error or duress, or the party is incapable of giving consent from want of age, or mental incapacity, or where one of the parties was impotent before marriage. At the common law the canonical disabilities, consanguinity, affinity and impotence, rendered the marriage voidable and not void. This is, however, modified by statutes declaring certain marriages void for consanguinity and affinity. Voidable marriages are, of course, good for every purpose until avoided; the children are legitimate; the survivor is entitled to the rights of a husband or wife, and the wife is entitled to dower. During the existence of the voidable marriage neither party can marry again.''

On the other hand if a marriage be absolutely void and not merely voidable, it may be attacked to defeat the dower given by statute to the widow. [Higgins v. Breen, 9 Mo. 1. c. 497.] Such attack is palpably a collateral attack. It should be kept in mind that we are not dealing with divorce; that the case is not one for a divorce—for the finger of death has long ago written and entered herein an unappealable final decree—but a suit in a court of equity for annulment of a marriage averred to be void *ab initio* for lack of mental capacity to consent to it. The distinction between an action for divorce from the bonds of a valid marriage and an action in a court of equity to annul a void or voidable marriage as applied to our Missouri statutes, seems to be that the latter largely follows the ancient jurisdiction of equity (Meredith v. Meredith, 79 Mo. App. 636; Ridgely v. Ridgely, 79 Md. 298) and lies for causes existing at or before the marriage, while the former lies for causes which arose subsequent to the marriage, or for causes of which (though existing at the time of the marriage) the party seeking annulment was in ignor-

ance. [Pyott v. Pyott, 191 Ill. 280.] "A right of action for the annulment of a marriage accrues immediately upon knowledge or discovery of the invalidating fact or circumstances, and, unless sooner barred by some Statute of Limitation, continues until the marriage is dissolved by the death of one of the parties, after which event no decree of nullity will be made *except under very exceptional circumstances.*" [26 Cyc. 909.] Happily we need not here inquire or rule whether in any case it be or be not against good morals to allow collateral kin and heirs, or any other heirs to overturn a marriage after the death of one of the spouses for mere lucre's sake upon some one or more of the many grounds of equity jurisprudence. We rest upon solid ground in ruling, that in no event can a marriage which is not absolutely void, but merely voidable, be attacked in equity by the heirs of a deceased spouse after the death of the other spouse. [1 Bishop, Marriage and Divorce, 292.] Since the marriage in the instant case was entered into in the State of Arkansas its validity is to be construed by the Arkansas statute (Banks v. Galbraith, 149 Mo. l. c. 536; 26 Cyc. 829; 2 Nelson, Divorce and Separation, sec. 568, supra), which makes it voidable only.

We concede that there exists much contrariety of opinion upon the question of whether the well-settled rule which requires the "validity of a marriage" to be tested by the *lex loci,* connotes within the purview of this *validity,* not alone matters of form and ceremony, but the more intimate matters of the inherent nature, force and effect of the contract thus made. In other words, if such a contract be only voidable by the *lex loci,* will it nevertheless be void by the *lex domicilii,* if it would have been void in the place of domicile if entered into there? That the converse is almost universally true, i. e., that a marriage void where celebrated is void everywhere else, there can be little doubt. [26 Cyc. 831, and cases cited.] We cannot find

Henderson v. Henderson.

that this point has ever been considered or passed upon directly in this State; though by the most obvious analogy, we have agreed to it. For example, we have held marriages according to the Indian customs and forms valid, even though such marriages in form and ceremony scarcely reached the status of a common-law marriage and notwithstanding such marriages recognized the right of the husband to dissolve the same and put away the wife at his—and even at either spouse's—volition. [Boyer v. Dively, 58 Mo. l. c. 520; Johnson v. Johnson, 30 Mo. 72.] A contrary view is said to be taken in England (Brook v. Brook, 9 H. L. Cas. 193) and seemingly upon principle in some of the American States, yet the reasons for these holdings will be found to be bottomed for the most part upon the fact that the marriage held to be invalid (though valid where celebrated) violates some distinctive policy of the State or country of the domicile, e. g., laws against incest, polygamy, or miscegenation. [Hills v. State, 61 Neb. 589, 57 L. R. A. 155, and cases cited in note.] In the very excellent and carefully considered note appended to the above case, the learned author, at page 173 (57 L. R. A.), says:

"The doctrine that best accords with the decisions, though there is a decided conflict of authority on the point, is that the *lex loci* governs with respect to the matrimonial capacity of the parties, as well as with respect to the manner or form of solemnization. . . . In some of the cases the decisions condemning marriages celebrated elsewhere between persons domiciled at the forum are apparently referred to the principle that the *lex domicillii*, and not the *lex loci*, governs with respect to matrimonial capacity; but, as pointed out, supra, most of these decisions are, at least, so far as their facts are concerned, explainable upon the theory that the marriage in question was contrary to the distinctive public policy of the forum. When that is the case, it is, of course immaterial for practical

purposes whether the *lex domicilii* or the *lex loci* be regarded as the general doctrine, since, even if the latter be adopted as such, it will not apply to the particular case. When, however, the marriage is not contrary to the distinctive public policy of the forum, it may be of vital importance whether the *lex loci* or the *lex domicillii* is adopted as the test of matrimonial capacity, and it is apparent that cases of this kind are entitled to greater weight upon the question whether the *lex loci* or the *lex domicillii* governs, than cases in which it was not necessary to choose between the two. When due attention is paid to this distinction, it is believed that the weight of authority, in America at least, will be found to establish the *lex loci* rather than the *lex domicillii* as the general test of matrimonial capacity, subject to the exceptions referred to.''

The view to which we here lend our concurrence is likewise approved in Ruling Case Law, wherein the rule is thus stated:

''There are expressions in the opinions in some of the cases which seem to favor the very questionable doctrine that, while the *lex loci* governs with respect to matters affecting the manner or mode of solemnization of the marriage and the preliminaries thereof, the question of matrimonial capacity is to be determined by the *lex domicillii;* and some of the decisions seem to be the result of the application of that doctrine. This is particularly true in the case of the English decisions. But most of these cases can readily be classified into one of the two well-recognized exceptions to the general rule—first, marriages which are polygamous, or which are incestuous according to the general view of Christendom; and secondly, marriages which the local lawmaking power has declared shall not be allowed any validity. By the first exception the Christian standard of marriage is applied to every marriage, wherever celebrated and without reference to the domicile of the parties at the time of its celebra-

tion. If the marriage falls below this standard, it will be held void although it may be valid according to the *lex loci* and *lex domicillii*. In regard to the second exception the legislature has, beyond all possible question, the power to enact what marriages shall be void in its own state, notwithstanding their validity in the state where celebrated, whether contracted between parties who were in good faith domiciled in the state where the ceremony was performed or between parties who left the state of domicile for the purpose of avoiding its statute, when they come or return to the state; and some of the states have in terms legislated on the subject. In conclusion it may be said that the better rule in this country, supported by some authority in England, and the one in truest accord with advancing conceptions of justice is that capacity or incapacity to marry depends on the law of the place where the marriage is celebrated, and not on that of the domicile of the parties." [5 R. C. L. 998.]

Since then the marriage is merely voidable and one of the spouses is dead, it may not be attacked here by those whose sole interest in it is sordid.

III. We could well have reached this same conclusion upon another ground, to-wit, that of the weight of the evidence. It is but a reiteration of the holding in a thousand books to say that since this is an equity case we try it *de novo* and may find contrary to the finding of the learned chancellor who tried it below, if we believe the weight of the evidence so falls; but that when the evidence is so evenly balanced as to leave us in doubt where the superior weight of credibility lies, we may defer to the finding of the court below. [Morgan County Coal Co. v. Halderman, 254 Mo. 596.]

Upon this view we need not rely upon the holding alone of the learned chancellor; we may defer if we see fit from its persuasiveness to the finding upon the ques-

*Marriage: Weight of Evidence.*

tions of fact involved, to the decisions of the Kansas City Court of Appeals, and to the ruling of yet another chancellor. For upon a motion in this case to dissolve the preliminary injunction herein issued and upon the dissolution thereof an appeal was prosecuted to the Kansas City Court of Appeals. The evidence upon which the case was tried upon that phase seems to have been practically identical with that in the instant case. Nevertheless, that court (Henderson v. Henderson, supra) refused to disturb the finding of the court below, holding that "it cannot be said that that [the evidence] of plaintiffs perceptibly overbalances or outweighs that of defendant." [Henderson v. Henderson, 141 Mo. App. l. c. 559.] It does not perceptibly militate against this view that the learned Court of Appeals was to an extent also considering the aspect of fraud, which charge has since been waived by plaintiffs in their briefs. The weight of the facts which in this case would abrogate it for the one cause would also serve to nullify it for the other.

The Court of Appeals set forth in the case supra all of the facts. These facts may be read in the opinion of that court, so we need not again print them in our reports. They stand there in that case just as they would stand here were we to set them forth again; indeed, it may well be that the Court of Appeals could have made them far stronger in favor of the views held by it, than it did make them. Two courts *nisi* and the Court of Appeals have weighed these identical facts and have held that there was no such clear and cogent proof of lack of mental capacity as the law exacts. [Payne v. Burdette, 84 Mo. App. 332; Slais v. Slais, 9 Mo. App. 96; Meredith v. Meredith, 79 Mo. App. 636.] With their findings and conclusions of fact we heartily agree. Touching this point and another here important, the learned judge who wrote the opinion for the court in Henderson v. Henderson, supra, at page 559 said:

"If we are wrong in our conclusion as to the weight of the most credible evidence, it must be conceded that there is such a conflict in that respect, that it cannot be said that that of plaintiffs perceptibly overbalances or outweighs that of defendant. In order to authorize a decree, at this late day, after the death of one of the parties, annulling the marriage on the ground of want of capacity of the deceased, such want of capacity should be shown by evidence clear and cogent, as a court of equity in such a case will not weigh the pros and cons in order to determine to a nicety which way the scales preponderate. There is something more at stake than an ordinary contest over the rights of property. Figuratively speaking it is a resurrection of the dead and demanding the severance of a tie he contracted in the flesh. The infirmities of his mind, and the afflictions of his body and the inmost secrets of his private life are laid bare to public scrutiny.

"We do not want to be understood as entertaining the opinion that the remedy should be denied in all instances, for we can well understand that the circumstances may be such as would demand the intervention of a court of equity, where to withhold its aid would effectuate a grievous wrong. But this is not a case of that kind, at best it is but a struggle for property."

It follows that for both or either of the reasons set forth above, the judgment should be affirmed. Let this be done. *Graves, Bond* and *Blair, JJ.,* concur; *Brown, J.,* concurs in paragraphs one and three and in the result; *Woodson, C. J.,* concurs in separate opinion; *Walker, J.,* dissents in opinion filed.

WOODSON, C. J. (concurring).—This case was first assigned to Division Number Two of this court, and after being argued and submitted, was decided by a divided court. For that reason, on motion, the cause was transferred to Court in Banc, where the cause was

reargued and submitted. At that time I field a dissent-
ing opinion to the divisional opinion, which was sub-
mitted for acceptance or rejection. The divisional
opinion was rejected by a majority of the members of
the court, and assigned to Brother FARIS to rewrite,
which in my opinion from his viewpoint has been well
done, but not from mine, in certain respects.

I therefore refile herein my dissenting opinion
heretofore filed to the divisional opinion, as a concur-
ring opinion in the result of the majority opinion filed
in Banc.

I wish here to add a query, viz: If, under the
Arkansas statute the contract of marriage was only
voidable, as my learned associate holds, and yet not
personal to the deceased and his wife (as I contended
it was), then, by analogy and parity of reasoning, why
may not the collateral relatives in this case attack the
voidable contract as well as a void one? In either
view of the case I respectfully submit that if the con-
tract of marriage is not personal to the contracting
parties, then no valid reason can exist to prevent the
heirs from contesting the one, if they have the legal
right to contest the other.

According to the majority opinion nothing but the
title to the land is or can be involved in this case, be-
yond a suit against a dead man, who has and can have
no representation to contest the validity of such a con-
tract.

This must be self-evident.

For the reason suggested I concur in the result
reached in the majority opinion, and as a further
amplification of my reasons I here append my dissent
from the opinion written in this case by my learned
Brother in Division Two, both as to the conclusions of
facts found and the principle of law applied thereto.

I. After a careful reading and due consideration
of the voluminous record in this case I have reached

the conclusion that Ernest Henderson, deceased, the husband of Helen R. Henderson, the principal defendant herein, was mentally capable of contracting the marriage with her, mentioned in the pleading and evidence.

This alone in my opinion should constitute a finality of this case in favor of the defendants; but these observations regard only the parties to this suit, while the principles of law announced therein, if adhered to, would be far reaching and in the future effect the entire State.

For the reason stated I hereby wish to vigorously state my opposition to any and all lax, flexible and loose rules of law which will permit the craving for dollars and cents to question the validity of a marriage after the death of one or both of the contracting parties.

With no design to criticise any one, but with due deference to all, I must insist that, in my opinion, no court, after due consideration of the marriage contract, the marriage and domestic relations that exist between man and wife, taken in connection with the great interest that society has in those matters, and their far-reaching influence and effect upon all government, as well as upon mankind itself, can, with any shadow of reason, justification or devotion to country, after the death of one of the parties to the contract, neither of whom ever objected thereto, write the words, "I hereby in the name of the law, burst asunder that which God has joined together;" and especially when the love of money, the root of all evil, constitutes the sordid wedge relentlessly driven into the sacred memory of the holy bond of matrimony, and that too, after the God with whose permission it was tied, has in his wisdom called one of the contracting parties unto himself to be judged according to the book of life.

265Mo.47

II. What is it, that plaintiffs, the collateral heirs at law of Ernest L. Henderson, ask this court to do? Answer: First, to *divorce* said Ernest L. Henderson, deceased, from Helen R. Henderson, his surviving widow; and, second, to restrain her and her codefendants (who are acting for her) from receiving and enjoying any of the property her husband died seized of, which under the laws of the State belong to her as an incident of the marriage.

In other words, plaintiffs claim that at the time Ernest L. Henderson married the defendant, Helen R. Henderson, he was insane, so unsound in mind that he did not know or understand what he was doing, therefore the contract of marriage entered into by and between them and solemnized in conformity to the laws of God and man, was absolutely null and void, notwithstanding the fact that thereafter they lived together for many months, if not for years (I disremember the exact time), as man and wife, without objection or protest from the plaintiffs or any one else, until his death separated them and thereby unlocked the doors to the vaults of gold here claimed by his collateral heirs.

Now, how do they propose to accomplish that end? Answer: By inducing this court to solemnly decree said marriage contract, entered into by and between them, solemnized according to law, dissolved and for naught held.

What was that contract, after having been so solemnized? Answer: It was a marriage—a status which the law, by their agreement, placed upon them.

In litigation that status or that relation is defined to be the *res* or the subject-matter of the suit, and consequently in the very nature of things, a divorce suit or any proceeding to dissolve that relation must in the very nature of things be a proceeding *in rem*. [Gould v. Crow, 57 Mo. 200; Anthony v. Rice, 110 Mo. 223.]

This is the basis upon which all suits for divorce and all proceedings to dissolve a marriage are predi-

cated. The husband and the wife during their lifetime are and *must be the parties to the suit,* either in their own persons or in the names of their representatives; and the subject-matter of all such suits is the marriage contract—that is, the marriage relation—the *res.*

This is true of all the States of the Union, and is recognized in many cases by the Supreme Court of the United States. In fact, such a suit or proceeding could not in the very nature of things be maintained except upon that theory.

To illustrate: Suppose no property rights were involved, and for many reasons a dissolution of an unholy alliance even after the death of one of the parties, might be desired by friends and relatives, grounded upon reasons more sacred and valuable than red gold; who, under the law, in such a suit would or could represent the deceased party to the contract? No one, of course, for the obvious reason that all suits, civil and criminal, must have a party or parties and a *subject-matter of the suit*—otherwise there would be nothing for the court to adjudicate.

This is true, although in a sense somewhat modified even in *ex parte* proceedings and proceedings *in rem,* which are familiar to the bench and bar.

The identical question here presented was decided by this court in the case of Lieber v. Lieber, 239 Mo. 1. The only difference between the facts of that case and this was: In that case the marriage had been dissolved, first, by a decree of court, while both parties were living, and, second, by the death of Mr. Lieber some forty years subsequent thereto, both having occurred prior to the institution of that suit; while in the case at bar, the marriage was dissolved by the death of Mr. Henderson before this suit was instituted. So it is perfectly apparent that, in so far as this question is concerned, there was no difference whatever between the legal propositions involved in the two

cases. In discussing this question in that case, the court on page 55 used this language:

"Not only does the record upon its face show that this suit is only a collateral attack upon the Illinois decree for divorce, but it also shows that in the very nature of things a direct proceeding for that purpose could not possibly have been brought and maintained, for the simple reason that a judgment in a divorce case is one *in rem* (Gould v. Crow, 57 Mo. 200), and Alexander Lieber, the plaintiff, in whose favor that judgment was rendered, is dead. He, therefore, could not have been made a party to such a suit, nor could such a suit have been maintained against him, even though it should have been instituted. Not only that, the subject-matter of such a suit is and would necessarily have to be the 'judgment *in rem*,' which was rendered in the divorce suit, which in truth and in fact is nothing more or less than the *dissolved marital relation, which formally existed* between Alexander Lieber and Margaret Lieber. That judgment *in rem*, or dissolved relationship, would not descend to his heirs, nor would it pass into the hands of his executor or administrator. Consequently there could be no person or thing represented in any such suit after one of the parties thereto has died. This is clearly the reason why counsel did not bring a direct bill in equity to set aside the Illinois decree for divorce."

The same general principle of law was announced by Judge LAMM in the case of Bishop v. Brittain Investment Co., 229 Mo. 699, in the discussion of the admissibility of the testimony of the surviving party when the other party to the cause of action, the marriage contract, in issue and on trial was dead. The Lieber case was largely based upon the principle of law announced in that case, as will be seen by the following quotation taken from pages 27 and 28 of the Lieber case:

"In the case at bar, the plaintiff's right to a homestead in the lands of Alexander Lieber depends just as much upon the existence of the marital relation between her and him, at the date of his death, as did Mrs. Bishop's right to dower in the lands of the Investment Company 'hinge on a contract of matrimony and its performance' with Dr. Bishop. And as was there said by Judge LAMM, 'that was the issue tried;' and here, the question tried is, was Margaret Lieber the wife of Alexander Lieber at the time of his death?

"If he was divorced from her at that time, then she was not his wife, and she was no more competent to testify regarding the divorce proceedings than was Mrs. Bishop qualified to testify regarding her alleged marriage to Dr. Bishop.

"That the decree for divorce was granted in the case of Alexander Lieber against Margaret Lieber, there is no question. In fact, plaintiff's amended petition, and entire case, proceeds upon the theory that the decree was granted and valid upon its face, and for that reason she seeks to have it set aside and that it was procured by fraud.

"Now concede, for the sake of the argument, that this decree is impeachable in this character of a proceeding, which I deny, nevertheless, it being fair and regular upon its face, it is entitled to full faith and credit until impeached and set aside upon competent testimony. That being unquestionably true, it cannot be legally said that Margaret Lieber was the wife of Alexander Lieber at the time of his death.

"The only difference between the two cases is the fact that the contract of marriage, which was one of the constituent elements of the cause of action in issue and on trial in that case, if entered into, made Dr. Bishop and the plaintiff there husband and wife, and consequently entitled her to dower; while in the case at bar the decree of divorce, it is admitted, destroyed the marital relation which existed between Alexander

Lieber and Margaret Lieber, and as an incident thereto destroyed her right to a homestead in his lands, until, at least, the same is set aside and for naught held, which is sought to be done in this case, and that decree, therefore, being one of the necessary constituent elements of plaintiff's case, is equally in issue and on trial here, as was the marriage contract in the Bishop case, and consequently since Alexander Lieber, the other party to that cause of action is dead, Margaret Lieber the surviving party thereto, under the authorities cited, is disqualified as a witness to testify in this cause, touching the impeachment of that decree.

"We are, therefore, clearly of the opinion, that the plaintiff was not a competent witness in this case, to testify, as she did, to matters regarding or tending to impeach the decree of divorce rendered by the circuit court of Mercer county, Illinois, in the case of Alexander Lieber against Margaret Lieber, the defendant there, and the plaintiff here."

From these observations it must be apparent to every one that it is not only a legal but a physical impossibility for a court to dissolve the marriage contract, *the res,* after it has been completely and forever severed by the death of one or both of the parties thereto, which according to its *express terms was to endure for life only,* and upon the authority of the Savior, there is no marriage in Heaven.

From this it is seen that while marriage, divorce and death may and do have something to do with the acquisition and disposition of real estate, yet not in the sense that it is acquired or disposed of by deeds of conveyance executed by and between the parties thereto, but solely in the sense that the law, in all such cases, of its own operation *purely as an incident* to the marriage, divorce and death gives and disposes of those classes of property denominated marital rights and inheritances. Neither man nor court has any con-

trol whatever over such acquisitions or dispositions of property.

Man and women with the sanction of the law may marry; the courts at the request of either party, for good cause shown, may dissolve the marriage, and death of the one always does so; but neither given the property, but the law, as before stated, as an incident thereto, bestows the property upon those designated by the law, when those conditions arise.

It must therefore be apparent that after the law has thus bestowed the property upon the parties designated purely as an incidental matter, the courts cannot take hold of that incident as a makeshift, and through that assume jurisdiction over the marriage contract and dissolve it when the death of one of the parties had dissolved it long before, and especially should that be true when the dead party is not and cannot in any possible way be represented.

Such a proceeding might and doubtless would, in many cases, prevent man and wife from saying that his or her property should go to the survivor under the law, or to their children.

If the dead lives in the Lord, then such a decree as here asked for would put the deceased to shame, and at the same time cast odium upon his wife and children.

Shame upon such a law—if it be a law.

WALKER, J. (dissenting).—I do not concur in the application of the Arkansas statute to the contract of marriage reviewed in the majority opinion. [Sec. 5175, Kirby's Digest.] This statute prescribes that whenever a party shall, from want of understanding, be incapable of consenting to a marriage, the same shall be void *from the time its nullity shall be declared by a court of competent jurisdiction.* This statute in effect declares a marriage where one of the parties is mentally incapable of consenting thereto valid until

set aside by a court, and thus renders the contract voidable instead of void. Under this classification it can only be questioned by a direct proceeding between the parties and during the lives of both. [2 Nelson on D. & S., sec. 569; Stuckey v. Nethes, 24 Hun, 461.] The operative force of a law of this character is to declare a marriage, under the condition stated, void in substance but simply voidable as to procedure. In my opinion this court is not called upon to follow such a law, which, if it does not involve an absurdity, at least contains a contradiction.

In addition, it is a fundamental principle that each State has the right to determine the marital status of its own citizens and prescribe the terms and conditions upon which marriages may be annulled or dissolved. [Mitchell v. Mitchell, 117 N. Y. Supp. 671.] While it is not deemed necessary in voicing this dissent to enter into a discussion of the doctrines of *lex loci* and *lex domicilii* as applied to marriage contracts, it will suffice to say that the rule which declares that a marriage valid where made is valid everywhere has no application here, and is only properly applicable as to matters affecting the manner and the mode of the solemnization of a marriage and the preliminaries thereof, while the question as to the matrimonial capacity of the parties, which is the question here involved, is to be determined by the law of the forum or the domiciliary law of the parties at the time the right of action accrued.