Elizabeth L. Sledd *v*. State Compensation Commissioner

(No. 7135)

Submitted January 27, 1932.    Decided February 9, 1932.

*H. E. Dillon, Jr.*, and *T. A. Myles*, for appellant.

*Howard B. Lee*, Attorney General, and *R. Dennis Steed*
Assistant Attroney General, for respondents.

Maxwell, Judge:

James E. Sledd was killed October 17, 1930, by an accident
in the course of and resulting from his employment with the
White Oak Fuel Company, a subscriber to the Workmen's
Compensation Fund.    Elizabeth L. Sledd, claiming to be his
widow, made claim to compensation which was denied by the
commissioner August 1, 1931, from which denial she appeals.

In 1921 she married one John Slade and lived with him
until, when she discovered he had an undivorced wife living,
and separated from him.    On September 2, 1924, she mar-
ried the deceased employee without having obtained annul-
ment of her marriage with Slade.    She and Sledd lived to-
gether as man and wife until his accidental death.

The commissioner denied compensation on the ground that
she had a husband (Slade) living at the time of her mar-

riage to Sledd, and therefore was not the widow of the deceased employee.

The question presented is whether a woman who is married to a workman and living with him as his wife at the time of his accidental death should be denied compensation because she had a husband living at the time of her marriage to the deceased? (For purposes of the immediate discussion we are assuming that Slade is living. The record does not disclose whether he is or not. The claimant says she has been trying to ascertain his whereabouts but has failed.)

At common law a disability to contract a marriage, such as having a lawful living husand or wife, rendered a subsequent marriage absolutely void *ab initio,* and it was good for no legal purpose. The wife of such a marriage was not entitled to dower and the children were illegitimate. *Cartwright* v. *McGown,* 121 Ill. 388, 12 N. E. 787; 38 Corpus Juris, 1292. In many of the states, a marriage when one of the parties has a husband or wife living and undivorced, is void, and being a nullity, no decree is necessary to avoid it. Illustrative is *Reeves* v. *Reeves,* 54 Ill. 332; *Drummond* v. *Irish,* 52 Iowa 41, 2 N. W. 622; *Blossom* v. *Barrett,* 37 N. Y. 434, 97 Am. sec. 747; *Glass v. Glass,* 114 Mass. 563; *Martin* v. *Martin,* 22 Ala. 86. The Virginia statute found in the Code of 1860, chapter 109, section 1, declared all such marriages "absolutely void, without any decree of divorce, or other legal process," but that marriages prohibited on account of consanguinity or affinity should be void from date of decree avoiding them. Our statute, incorporated in the Code of 1868, radically changed the common law and the law of Virginia, and made such bigamous marriages "void from the time they are so declared by a decree of divorce or nullity." This is carried into the Code of 1931, 48-2-1, except that the proceeding is there denominated "decree of nullity" and not "decree of divorce or nullity" as formerly. Under our statute, therefore, such marriages are not void *ab initio,* but become void only by judicial determination.

The general rule is that a voidable marriage is regarded as practically valid until its nullity is declared by a court of compentent jurisdiction within the lifetime of the parties.

18 Ruling Case Law, p. 690. Of course an individual may be convicted of the crime of bigamy though there has been no decree of annulment. What effect such conviction would have upon the claim of the guilty party for compensation need not now be considered.

Where there exists the distinction of the common law and the canonical law between *void* and *voidable* marriages, the former may be attacked collaterally even after the death of one or both of the parties, but the latter may be attacked only within the lifetime of the parties.

"A void marriage is a mere nullity, and its validity may be immpeached in any court, whether the question arise directly or collaterally, and whether the parties be living or dead." II Schouler on Marriage, Divorce, etc. (6th ed.), p. 1353. For same proposition see also I Bishop on Marriages, etc., p. 106. As to a voidable marriage Schouler says, at page 1356 of volume cited, "Unless the suit for nullity reaches its conclusion during the lifetime of both parties, all proceedings fall to the ground, and both survivor and offspring stand as well as though the union had been lawful from its inception." As to the distinction between void and voidable marriages a learned author says: "A void marriage confers no legal rights, and, when it is determined that the marriage is void, it is as if no marriage had ever been performed. * * * A voidable marriage differs from a void marriage in that it may be afterwards ratified by the parties and become valid and usually is treated as a valid marriage until it is decreed void." Keezer on Marriage and Divorce, p. 16. Ordinarily "the canonical impediments, such as consanguinity, affinity, and impotence, render the marriage voidable, the civil, such as a prior marriage, idiocy, and the like, usually render it void." Bishop, *idem.*, p. 113.

Our statute has done away with this distinction. Under it there is only one rule and it declares that the forbidden marriages shall be void from the time of decree of nullity. Code, 48-2-1. The query arises: When can this be done? Must it be done within the lifetime of the parties as under the common law rule pertaining to voidable marriages? If so, a bigamous spouse would share in the estate of the one

to whom he or she had been unlawfully married. The right of the surviving spouse could not be challenged. This cannot be the intent of the law, certainly as to bigamous marriages. It would be unreasonable. A bigamous marriage should be open to attack, under our statute, even after the death of one or both of the parties, just as at common law, otherwise an innocent former spouse, or children of the decedent (not of the bigamous marriage), might be greatly wronged; but such attack must be made in a court of competent jurisdiction and not before an administrative officer of the state government. Such officer has no authority to investigate a bigamous marriage and declare it to be such, thus rendering an annulment which is solely a court function. One reason for a statute such as ours, requiring a judicial determination to be had is that an opportunity may be given for a hearing and a judicial record made so that it cannot be denied. There has been no effort to annul the marriage between the claimant and James Sledd.

The commissioner relies upon *Coletrane* v. *Commissioner,* 86 W. Va. 179, 103 S. E. 102, as authority for refusing compensation to the claimant. In that case, Coletraine, the deceased workman, had two living wives; the first lived in North Carolina and the bigamous one in West Virginia, where he worked at the time of his death. He supported his wife in North Carolina, visited her and her children by him, cohabited with her on his frequent visits, and she did not know of his alleged second marriage in this state. Each claimed compensation. The commissioner refused the first wife compensation on two grounds, first, that the deceased was married a second time, and second, that the first wife was living separate and apart from him. We held that they were not living separate and apart, nor had he abandoned her nor failed to contribute to her support so as to deprive her of her right to participate in the Workmen's Compensation Fund; and, further, the fact that he had contracted a bigamous marriage with another woman and cohabited with her in this state did not operate to deprive his lawful wife of her right to participate in the fund.

The distinction between that case and the instant case is

manifest. There two wives were involved. The rights of the lawful wife were unaffected by the husband's subsequent unlawful relations with the second woman. Here, there is not presented a case wherein there was a man with two wives, but a man with one wife, the claimant. She was his wife *de facto,* and *dejure* too in the absence of judicial determination to the contrary. It is urged that to allow this claimant compensation would be to permit her to profit by her own wrong. But, we ask, who can declare her guilty of a legal wrong in the absence of an adjudication?

As already noted, the record does not disclose whether John Slade, the claimant's husband, is living. In fact it does not disclose with certainty (it appears inferentially merely) that he was living at the time of claimant's marriage with Sledd. In situations such as this, there is to be found demonstration of the wisdom of our statute in not permitting a marriage to be declared void in the absence of judicial ascertainment of the facts, and formal adjudication.

The proposition that the claimant's marriage with Sledd is void *ab initio* because she had a former husband living and undivorced when she married Sledd, destroys itself, for the reason that, by the same token, her prior marriage with John Slade was void *ab initio,* because he then had a prior wife living and undivorced. If her marriage with Slade was absolutely void, it did not stand in the way of her marriage with Sledd. This would necessarily be the holding if the common law rule which prevails in some of the states were in effect here. ''The marriage of a woman with a man whose wife by a former marriage is still living, undivorced, is void, and her subsequent marriage with another is valid, although her husband by such void marriage is living.'' *Reeves* v. *Reeves,* 54 Ill. 332.

For the foregoing reasons we reverse the finding of the commissioner and remand the case for further proceedings not inconsistent with this decision.

*Reversed; remanded.*