In the Matter of the Estate of MARTIN BURKE, Deceased.

Surrogate's Court, Bronx County, March 26, 1932.

*Black, Varian & Simon* [*Herbert M. Simon* of counsel], for the petitioner.

*James E. Smith, Jr.,* for the administrator.

HENDERSON, S. The question for determination in this proceeding is the status of the petitioner, who alleges that she is the widow of the decedent. Letters of administration were issued to a brother of the decedent, who obtained his letters by an allegation that the decedent left no widow. The petitioner was not cited in that proceeding, and she seeks to have the administrator's letters revoked because of the alleged misrepresentation of a material fact (Surr. Ct. Act, § 99).

The decedent was a member of the municipal fire department in the city of St. Louis, Mo., for many years. He came to New York after his retirement from the department in 1930, and took up his residence with his brother, the administrator.

There was no ceremonial marriage. A common-law marriage is alleged to have taken place in 1904 in St. Louis, where both the petitioner and the decedent continuously resided until the decedent came to New York a short time before his death. Almost all of the witnesses in this proceeding live in St. Louis. Their testimony was taken by deposition in St. Louis and the record is voluminous. With the exception of the deposition of one witness, each side has offered in evidence the depositions taken in its behalf. One deposition taken in behalf of the petitioner was not offered by her but by the administrator. It was stipulated that objections to any matters included in the depositions be submitted in writing. Both sides filed a number of objections upon which I have ruled as follows:

*Administrator's objections:* The following objections have been sustained: Nos. 1, 5, 57, 73, 74, 112 to 116, 122, 123, 126, 130,

149, 150, 151, 154, 155, A, B, C, D, E, 156, 157, 158, 159, A, D, E, F, G, 160, A, B, C, D, G, H, J, K, 161, 162, A, B, D, E, F, G, 163, 164, 165, 166, B, E, F, G, H, 167, A, B, C, D, E, 169, A, C, D, E, F, G, 170, 171, 172, C, E, F, 173, 174, A, B, C, G, 175, C, 176, A, B, C, E, 177, D, E, F, 178, 179, A, B, C, 180, D, J, K, 181, A, F, G, H, J, 182 to 189, 190, A, C, D, E, F, 191, 192, 193, A, 197, D, E, F, 198, 199, 200, 206.

The following objections have been overruled: Nos. 2, 3, 4, 7 to 11, 13, 14, 16 to 56, 58 to 72, 75 to 111, 121, 124, 125, 127, 128, 129, 131 to 141, 143 to 148, 152, 153, 155, F, H, J, 159, B, C, 160, E, F, 162, C, 166, A, C, D, J, 167, F, 168, A, B, C, 169, B, 172, A, B, 174, D, E, F, 175, A, B, D, E, F, G, 176, D, 177, A, B, C, G, H, 179, D, E, 180, A, B, C, E, F, H, 181, B, C, D, E, 190, B, 193, B, C, D, 194, 195, 196, 197, A, B, C, 201, 202, 203, 204, 205.

The following answers have been stricken out: Nos. 6, 12, strike out everything in answer after "night;" 14, A, 15, 117, 118, 119, 120, 142, 155, G, 159, J, and in H everything after "1920," 168, D, 172, in D after "demolished it," 180, G.

*Petitioner's objections*: The following objections have been sustained: Nos. 1 to 4, 6, 27, 43, 45, 46, 48, 50, 52, 54, 55, 57 to 61, 64, 72, 77, 78, 81, 84 to 88, 91 to 152, 164, 166, 167, 168, 172 to 175.

The following objections have been overruled: Nos. 5, 7, 8, 9, 11 to 19, 21, 23, 24, 25, 28 to 37, 39, 40, 41, 44, 49, 51, 62, 63, 66, 68, 70, 71, 74, 79, 80, 82, B, 83, 89, 90, 153 to 163, 165, 169, 170.

The following answers have been stricken out: Nos. 10, 20, 22, 26, 38, everything after "Minogues," 42, 47, 53, everything from "I took it for granted" to the end of the answer, 56, everything after "still there," 65, after "on our balls," 67, 69, everything after "before," 73, 75, 76, everything after "anything," 82, A, 171, everything after "in St. Louis."

The following exhibits have been received in evidence:

*Petitioner's exhibits*: Nos. 1 to 11, 19, 20.

*Administrator's exhibits*: Nos. 2 to 10, 13 to 17, 20, 21, 22.

Objections to the reception of all other exhibits have been sustained.

The petitioner alleges that the marriage occurred on November 24, 1904, at St. Louis, Mo. The evidence shows and I find that prior to 1921 common-law marriages were valid in the State of Missouri. Section 19 of the Domestic Relations Law (Laws of 1896, chap. 272, as added by Laws of 1901, chap. 339) provided as follows: "No marriage claimed to have been contracted on or after the first day of January, nineteen hundred and two, within this State, otherwise than in this article provided, shall

be valid for any purpose." The foregoing statute was the law of this State between January 1, 1902, and January 1, 1908. The administrator contends that the alleged marriage was not in accordance with the above statute, and that even if there was a common-law marriage, it was invalid. The petitioner does not contend that the alleged marriage was in conformity with the New York statute in effect in 1904, but urges that it complied with the laws of Missouri, which is the law which governs the marriage in this case. For some time prior to 1904 and until October, 1930, both the petitioner and the decedent were residents of and domiciled in the State of Missouri. To hold a marriage invalid, contracted in a sister Commonwealth in accordance with its laws between two residents of that State domiciled therein, would be abhorrent to a sense of justice. The New York statute by its express provisions applied only to marriages " within this state." It could not and did not attempt to regulate marriages of citizens of other States contracted without our borders. It is the general rule that a marriage valid where contracted is valid here. (*Cunningham* v. *Cunningham*, 206 N. Y. 341; *Earle* v. *Earle*, 141 App. Div. 611; *Matter of Seymour*, 113 Misc. 421, 433.)

To constitute a common-law marriage in Missouri as well as in New York there must be a present agreement between competent parties to take each other for husband and wife. No witnesses to the marriage are necessary, and the contract itself need not be proven by direct evidence. Circumstances, such as cohabitation, declarations, acknowledgment, conduct and repute among neighbors, friends and relatives are all evidence of a marriage contract. The agreement to assume the status of husband and wife may be proven either by direct or circumstantial evidence. (*Gall* v. *Gall*, 114 N. Y. 109, 118; *Dietrich* v. *Dietrich*, 128 App. Div. 564, 567.)

The question here presented is whether a common-law marriage took place between the petitioner and the decedent in the State of Missouri prior to 1921. They cohabited at various times between 1904 and 1930. Were their relations matrimonial or meretricious? Has the petitioner established her status as the wife of the decedent by a fair preponderance of the credible evidence?

The decedent was a fireman from 1902 continuously until his retirement in 1930. From the date of his appointment until July 1, 1907, he worked ten days with three hours off for meals and was off duty the eleventh day. From July 1, 1907, until November 1, 1914, he worked five days and was off the sixth. From that date until May 16, 1921, he was on duty two days and off the third. After that he was on duty one day and off the next.

A collector for a furniture installment house testified that his

firm had an account with the petitioner carried under her maiden name. He made collections until 1912. The petitioner told him that she expected to marry the decedent. She lived with her mother and on a number of occasions he saw the decedent at the house on his days off. Her neighbors in the house and the janitor addressed her as Mrs. Burke. He said he knew the petitioner for about twenty-five or twenty-six years. This would make the date of his first meeting the petitioner 1905 or 1906. He may be mistaken as to this, however, as his firm went out of business in 1912 and he testified that he made collections from the petitioner for eight years. That would fix the date of the first meeting in 1904, the date of the alleged marriage being November twenty-fourth of that year.

Emma Burns knew petitioner since 1900. She met the decedent in the company of the petitioner about 1905. The petitioner introduced the decedent to the witness as her husband. The witness then introduced the decedent and the petitioner to her escort as Mr. and Mrs. Burke. The decedent acknowledged the introduction. In about 1907 the petitioner had a miscarriage. The witness was petitioner's nurse for about ten days. Petitioner was living with three brothers and her mother. The decedent paid the witness for her services. He came to the house every day and addressed the petitioner's mother as " Ma." The witness lost track of the petitioner and in September, 1929, looked for her. She was looking for petitioner's name in the vestibule of an apartment house. Decedent came in. The witness said: " ' Pardon me do you live here? ' He said, ' Yes.' I said, ' Do you ? I am looking for Mrs. Burke, does she live here?' He said, ' I am Mr. Burke.' He said, ' You are not Mrs. Burns? ' and I said, ' I am.' He said, ' Just follow me.' " He went up to the third floor, unlocked the door and called for Jessie. The decedent removed his coat and went back and forth about the apartment.

John Schlosser ran the bar at the Belleville House. He was associated in business with one Kreitner, through whom he met the decedent and the petitioner. The decedent introduced the petitioner to him as Mrs. Burke. They frequently came to the hotel for meals between the years 1913 and 1915 and he always knew the petitioner as Mrs. Burke.

Cordelia Tobinson, the daughter of a fireman, knew decedent as he had been a visitor in her home. In or about 1918 she was told to deliver a dress to Mrs. Burke by her employer. She rang the doorbell of the apartment. The decedent answered the bell. Witness asked if Mrs. Burke was there. Decedent called, " Jess." Petitioner came to the door and introduced decedent. She said, " This is my husband, Mr. Burke."

I find that petitioner's Exhibits 19 and 20 are in the handwriting of Mary Minogue, the sister of the decedent. They consist of a letter and an envelope. The letter is dated May 11, 1915, and the envelope is postmarked the same day. The envelope is addressed to Mrs. M. Burke and was sent to the petitioner. The petitioner is addressed in the letter as " Dear Friend." The writer asks for a loan and requests the petitioner not to mention the matter to Martin.

I find that petitioner's Exhibits 7, 8, 9 and 10 are in the handwriting of the deceased. The envelopes Exhibits 7 and 9 are addressed " Mrs. M. J. Burke." They are postmarked November 28 and December 1, 1920, respectively. The letters, petitioner's Exhibits 8 and 10, are dated November 28 and December 1, 1920, respectively. The letter of December 1, 1920, is signed " your loving husband, M. B."

Mr. and Mrs. Baldwin kept a rooming house. There was a tornado on September 29, 1927. After the storm the petitioner came to the rooming house with her brother, Walter Thomas. She rented two rooms. One was occupied by Walter and the other by the decedent and the petitioner. Decedent came to the house two days after the rooms were rented and inquired of Mrs. Baldwin for his wife, Mrs. Burke. Petitioner introduced decedent to Mr. Baldwin with the words, " This is my husband, Mr. Baldwin." Decedent came to the house frequently during a period of between six and eight weeks when they left.

P. J. Soucy, a real estate agent, rented an apartment to the decedent and the petitioner in 1928. He knew them as Mr. and Mrs. Burke. They came together and looked at apartments. The decedent said that " the wife wanted some work changed, and if I would do that to please the wife it would be all right." Decedent paid the rent. The receipt was made out in the name of the decedent and given to the petitioner.

Oliver W. Kortjohn, a salesman for an investment house, knew petitioner about six years. In July of 1930 decedent asked him to call at 230 Boyle avenue. When the witness arrived the decedent opened the door. The petitioner was there. The decedent introduced the petitioner to the witness as Mrs. Burke.

Walter Thomas, the brother of the petitioner, testified that he first met the decedent on Thanksgiving day, 1904, at dinner in his home. He was living with his sister, his mother and a brother. The mother and brother are since deceased. The decedent was a guest at dinner. During the dinner the decedent arose, embraced the petitioner and said, " I will take you for my wife if you will take me for your husband." The petitioner replied, " I will take you for

my husband." I attach little weight to the above testimony, as I believe it to be improbable. However, he stated and I find that after Thanksgiving the decedent and the petitioner occupied the same room in this household; that the decedent kept clothing in the room he occupied with the petitioner and brought his trunk there.

The administrator established that in 1920 the petitioner was arrested by two members of the St. Louis police department, one of whom was acquainted with the decedent. Her apartment was raided and she admitted that it was a house of assignation. Three couples were found in the apartment at the time of the raid. The petitioner described herself as the wife of the decedent. The decedent denied that petitioner was his wife when asked about it by the detective with whom he was acquainted.

One Charles Regli testified that he was secretary of the fire department in the early twenties. The petitioner complained to the chief that she was not being supported by the decedent. The decedent was sent for. The petitioner claimed to be his wife. He denied that she was his wife. He then stated that they had agreed upon a settlement by which he was to pay $300 to the petitioner and she was to release him of all future claims. The witness had such a contract drawn by the city counselor. It was signed by both parties in his presence and the money paid. One copy of the agreement was given to the decedent, one to the petitioner and another to the chief. The chief is dead and no copy of the agreement was found in the files of the department or in the personal effects of the witness.

The decedent cohabited with the petitioner in the same apartment with her mother and brothers. No matter what the morals of the petitioner and the decedent may have been, it is improbable that a meretricious affair would be carried on in the apartment where her mother resided. During the continuance of this relationship, which was marked by several separations, the petitioner used the decedent's name with his knowledge and without any protest from him. She introduced him as her husband and he introduced her as his wife. Among her neighbors she was reputed to be his wife and was apparently so accepted by decedent's sister, who addressed her in writing as Mrs. Burke. He addressed her by mail with the use of his name and signed himself, " Your loving husband."

His denial that he was her husband at the time of her arrest upon the assignation charge may have been due to embarrassment or fear of being himself involved. The incident before the fire chief is a strong circumstance against the marriage. He denied the marriage in her presence. She agreed to release him of all

liability thereafter for $300. Her conduct on that occasion is inconsistent with her claim of marriage and can only be explained on the theory that she did not think she could legally enforce her rights as a wife because there had been no ceremonial marriage. The subsequent conduct of the decedent, however, greatly weakens the inference against a marriage which might otherwise be drawn from that incident. After the settlement he again cohabited with the petitioner. He introduced her as his wife, approved the use of his name by her, and rented an apartment with her. Is it probable that if she was " just one of his good time girls," as he described her at the time of the conference with the chief, whom he had to pay to keep from annoying him, that he would resume such a relationship? It is more consistent with the inference of a resumption of marital relations after a separation. I find that the petitioner has established her status as the widow of the decedent by a fair preponderance of the credible evidence.

It follows, therefore, that the grant of letters of administration to Edward Burke was obtained by a false suggestion of a material fact, and his letters must be revoked. Settle decision and decree revoking the letters of administration heretofore granted to the respondent and directing him to account.