MARY MAY GOLDMAN, sometimes known as Mary May Dithrich, v. W. HEBER DITHRICH, individually and as representative of the heirs, devisees, and legatees of Edward G. Dithrich, deceased.

179 So. 715.

Division A.

Opinion Filed February 9, 1938.

Rehearing Denied April 1, 1938.

*Moreland E. Maddox* and *B. M. Skelton,* for Appellant; *Bussey, Mann & Barton,* for Appellee.

TERRELL, J.—William A. Goldman died October 13, 1931, leaving appellant as his surviving wife with whom he had years before contracted a common law marriage. On October 21, 1931, eight days after her husband's death, appellant went through a marriage ceremony with her son-in-law, E. J. Ganz in Brook County, West Virginia. She later moved to St. Petersburg, Florida, and on November 22, 1932, was married to Edward C. Dithrich who dies testate June 19, 1933, possessed of considerable real and personal property.

In due course, appellant dissented from the terms of Dithrich's will which was filed for probate in Pinellas County and exercised her election to take under the law rather than under the will. This suit was instituted by appellee individually and as representative of the heirs of the testator for the purpose of annulling the marriage between appellant and Edward C. Dithrich on the ground that at the time said marriage was contracted, appellant had previously entered into the marital relation with E. J. Ganz in West Virginia, that the said E. J. Ganz was still living, and that appellant's marriage with him had not been dissolved at the time she was married to the testator.

As defense to the suit to annul, appellant contends that her West Virginia marriage with E. J. Ganz was void *ab initio* by reason of the fact that said Ganz was a married man at the time of said marriage and was thereby incapacitated to contract a valid marriage. Appellee contends on the other hand that under the law of West Virginia, such a marriage was voidable only and not void, and hence

good until annulled by a decree of a court of competent jurisdiction.

The Chancellor found for appellee and entered his decree annulling the marriage. A petition for rehearing was filed wherein it was alleged that a decree annulling the West Virginia marriage between appellant and Ganz had been entered several days after the entry of the final decree annulling the marriage between Appellant and Dithrich and contending that such annulment related back to the date of the Ganz marriage, thus making appellant an unmarried woman at the time of her marriage to Edward C. Dithrich and legalizing the said marriage. The petition for rehearing was denied, the court again holding that the West Virginia marriage between appellant and Ganz was voidable only and hence valid until set aside by the Court but that the decree annulling said marriage was not retroactive so as to validate her marriage with Dithrich. This appeal is from the final decree and the order denying the petition for rehearing.

The vital question to be adjudicated is the legal status of the marriage in West Virginia between Appellant and E. J. Gunz.

The general rule is that marriage between parties *sui juris* is to be concluded by the law of the place where consummated. Story, Conflict of Laws (1st Ed.) 103, Loughran v. Loughran, 292 U. S. 216, 54 Sup. Ct. 684, 78 L. Ed. 1219; Henderson v. Henderson, 265 Mo. 718, 178 S. W. 175. If there was a marriage between appellant and E. J. Ganz its legality will be determined by the law of West Virginia as will the legality of her marriage with Edward C. Dithrich be determined by the law of Florida.

The West Virginia Code of 1916, page 916, Chapter 63, Section 10, contains the following:

"No woman shall marry her father, grand-father, step-

father, brother, son, grand-son, half-brother, uncle, *daughter's husband,* husband's son, or his grand-son, or step-son, brother's son, or step-son, or husband of her brother's or sister's daughter. (Acts 1872, c. 89; 1972-3, c. 161.)"

At page 920, Chapter 64, Section 1, the same code contains the following:

"All marriages between a white person and a negro; all marriages which are *prohibited by law on account of either of the parties having a former wife or husband then living;* all marriages which are prohibited by law on account of consanguinity or affinity between the parties; all marriages solemnized when either of the parties was insane or incapable from physical causes of entering into the marriage state, or under the age of consent, shall, if solemnized within this State, *be void from the time they are so declared by a decree of divorce or nullity.* (Code Va. 1860, p. 529.)"

From a reading of the foregoing, we must conclude that if there was in fact a valid marriage between appellant and E. J. Ganz in West Virginia, it was void only from the time it was so declared by decree of divorce or nullity in a competent court.

In our view, the pretended marriage between Appellant and E. J. Ganz was a nullity in its inception and was without binding force and effect. There is no dispute with reference to the facts of the transaction. It is shown that the marriage license was issued in the name of William A. Goldman, the deceased husband of Appellant, and in the name of Mary M. Stayer, who is in fact the appellant. E. J. Ganz, the son-in-law of appellant whose wife was living and from whom he was not separated, went with her (appellant) to procure the license and went through the marriage ceremony with her which was regularly per-

formed, though he (Ganz) impersonated William A. Goldman.

Appellant contends that she went through this pretended marriage with Ganz because her former marriage with Goldman was a common law marriage, that common law marriages were not recognized by law in West Virginia and that she wanted the record to show that she had a ceremonial marriage with Goldman to remove the stigma of bastardy from her daughter, the wife of E. J. Ganz, who was a child of her marriage with Goldman. Appellee contends on the other hand that her marriage with Ganz was a ruse to clear the record and enable her to secure a portion of the estate of W. A. Goldman, which she could not do as his common law wife. The fact that the date of the certificate was changed so as to read October 21, 1930, one year previous to its actual date and presented to the representatives of Goldman's estate for the purpose of securing a share therein gives support to the latter contention.

For the purpose of this case, it matters not which of these contentions is true. It is shown that Ganz and his wife were living together at the time, that he and appellant never lived or cohabited together nor ever intended to, that their pretended ceremonial marriage was in no sense actuated of love, affection, the purpose to establish a home and family or any other fact essential to constitute the marital state. By the admission of the parties the whole transaction was foreign to the vital purpose of marriage and we fail to find a single element of a valid marriage in it.

To constitute a valid marriage, the marital contract must be voluntarily entered into in good faith for the purposes actuating such contracts, the parties must be legally eligible to make the contract, and their status must be such that the union will not be contrary to public policy or obnoxious to

the prevailing social mores. The marriage in question offends against these requirements.

It is conclusively shown that there was no intention on the part of either party to enter into a life relation or to assume the responsibility imposed by law on those becoming parties to the banns. In fact, it may be reasonably inferred that neither party had any intention of giving effect to the marriage. Furthermore in view of the traditional gulf of infelicity that is said to separate the affections of mother-in-law and son-in-law, to contemplate the one in good faith, taking the other "for better or for worse" is a societal phenomenon that we are not ready to accept and the facts in this record are too skimpy to make it register in our sanctum of concepts. It was nothing more than a jest or mock marriage which is of no effect and there was no possibility of ratification by cohabitation or change in the status of the parties. McClurg v. Terry, 21 N. J. Eq. 225.

So far as the record discloses, the marriage between appellant and Edward C. Dithrich was entered into in good faith and was successful. It was regular in form and the parties lived together happily until the death of the latter. The common law marriage was no impediment to it. This assault was precipitated by heirs of the deceased to defeat the claim of appellant to an interest in his estate.

We are not convinced that proper showing has been made to invalidate said marriage so the decree below is reversed.

Reversed.

ELLIS, C. J., and BUFORD, J., concur.

WHITFIELD, P. J., and CHAPMAN, J., concur in the opinion and judgment.

BROWN, J., dissents.

Brown, J. (disssenting).—It is admitted by the appellant that on October 21, 1931, she procured a marriage license in Brooke County, West Virginia, to unite herself and William A. Goldman in marriage; that William A. Goldman, whom she had lived with in a common law relationship, had died prior thereto on October 13, 1931; that the person who appeared with her to procure the marriage license and who went through the marriage ceremony with her before a minister of the gospel, was her son-in-law, E. J. Ganz, who was married at that time, but that there was no cohabitation on the part of defendant and Ganz. Then without having that marriage annulled, the defendant moved to Florida, and on November 22, 1932, married Edward C. Dithrich, who died June 19, 1933. The Ganz marriage was not annulled until after the death of Dithrich, and four days after the final decree in the case now before us was rendered.

The general rule is that the validity of a marriage is governed by the law of the place of its celebration. Loughran v. Loughran, 292 U. S. 216, 78 L. Ed. 1219, 54 Sup. Ct. 684; Hopkins County Coal Co. v. Williams, 219 Ky. 156, 292 S. W. 1088; Henderson v. Henderson, 265 Mo. 718, 178 S. W. 175; Welch v. All Persons, 78 Mont. 370, 254 Pac. 179; Sturm v. Sturm, 111 N. J. Eq. 579, 163 Atl. 5; Matter of Burke's Estate, 143 Misc. 268, 256 N. Y. S. 862; Peefer v. State, 42 Ohio App. 276, 182 N. E. 117; Dondds v. Pittsburg, M. & B. Ry. Co., 107 Pa. Super. Ct. 20, 162 Atl. 486.

"Between persons *sui juris,* marriage is to be decided by the law of the place where it is celebrated." Story—Conflicts of Laws (1st Ed.) 103.

Thus the law of West Virginia governed the alleged marriage between the defendant and William A. Goldman and

the marriage between the defendant and E. J. Ganz, while the law of Florida governed the marriage between the defendant and Edward C. Dithrich. Whittington v. McCaskill, 65 Fla. 162, 61 So. 236.

Chapter LXIII, Sec. 10, Code of West Virginia (4th Ed.) 1899, which was the codification of Chapter 89, Acts of 1872 and Chapter 161, Acts of 1872-3, provides that "No woman shall marry her * * * daughter's husband * * *".

Chapter LXIV, Sec. 1, of the Code of West Virginia (4th Ed.) 1899, which was page 529 of the Code of Virginia, contains this rather unusual provision:

"* * *; all marriages which are prohibited by law on account of either of the parties having a former wife or husband then living; all marriages which are prohibited by law on account of consanguinity or affinity between the parties; * * *, shall, if solemnized within this State, be void *from the time they are so declared by a decree of divorce or nullity.*" (Italics supplied.)

The Supreme Court of Appeals of West Virginia in interpretating this last quoted statute in the recent case of Sledd v. State Compensation Commissioner, 111 W. Va. 509, 163 S. E. 12, said:

"* * * Our statute, incorporated in the Code of 1868, c. 64, radically changed the common law and the law of Virginia, and made such bigamous marriages 'void from the time they are so declared by a decree of divorce or nullity.' Section 1. This is carried into the Code of 1931, 48-2-1, except that the proceeding is there denominated 'decree of divorce or nullity' and not 'decree of divorce on nullity' as formerly. Under our statute, therefore, such marriages are not void *ab initio,* but become void only by judicial determination.

"The general rule is that a voidable marriage is regarded

as practically valid until its nullity is declared by a court of competent jurisdiction within the lifetime of the parties. 18 Ruling Case Law, p. 690."

This construction of the West Virginia statute by the Supreme Court of that State is binding upon this Court. See Meister v. Bissell, 96 U. S. 76, 24 Law Ed. 826. Other West Virginia cases holding this kind of marriage voidable are: Martin v. Martin, 54 W. Va. 301, 46 S. E. 120; Perky v. Perky, 87 W. Va. 656, 106 S. E. 40; Hall v. Baylous, 109 W. Va. 1, 153 S. E. 293. See also in this general connection 18 R. C. L. 439, 440; 38 C. J. 1276, 1307, 1327, 1346, 1360; Note in 51 A. L. R. 1412.

There are cases holding that where marriages between certain persons are incestuous or polygamous, or otherwise prohibited by the public policy and law of the forum, they will not be deemed valid therein though they are held valid in the State or place where they were celebrated and though the parties to the marriage were there domiciled at the time. See 5 R. C. L. 895 and Schouler on Domestic Relations, 5th Edition 37; Beale on The Conflict of Laws, Vol. 2, 687. At page 691 of Professor Beale's work just cited, it is said:

"The marriage between white and black persons in the southern states, if forbidden by their domicil, has always been declared void, as so subversive of the social order and strongly against the public policy of the state that it cannot be permitted. If parties domiciled in a southern state leave the state and go to another which permits such a union, and are there married, the marriage is nevertheless void by reason of this overwhelming policy of the domicil. If, on the other hand, parties to such a marriage are domiciled in a northern state the marriage will be held good in spite of a prohibition at the domicil. The difference

lies in the differing effect on the public mind in the two sections of the country: In the south miscegenation is socially odious; in the north it is merely unwise."

But in the case of State v. Ross, 76 N. C. 242, it was said:

"However revolting to us, and to all persons who by reason of living in states where the two races are nearly equal in numbers have an experience of the consequences of matrimonial connections between them, such a marriage may appear, such cannot be said to be the common sentiment of the civilized Christian world. When Massachusetts held such a number of negroes as to make the validity of such marriages a question of practical importance her sentiments and her legislation were such as ours are today. Medway v. Needham, 16 Mass. 157. Now, since she has got rid of her negroes, the question is of no practical importance to her. And as far as may be gathered from her statute book she considers such marriages unobjectionable. Most of the states of the Union, and of the nations of Europe with whom the question is merely speculative, take a similar view of it. It is impossible to identify this case with that of an incestuous or polygamous marriage admitted to be such *jure gentium*. The law of nations is a part of the law of North Carolina. We are under obligations of comity to our sister states. We are compelled to say that this marriage being valid in the state where the parties were *bona fide* domiciled at the time of the contract must be regarded as subsisting after their immigration here. The inconveniences which may arise from this view of the law are less than those which result from a different one."

This court is committed to a like view. In the case of Whittington v. McCaskill, 65 Fla. 162, 61 So. 236, this Court held that:

"Although marriages between white persons and negro persons are prohibited in this State both by the Constitution and statutes, where such a marriage takes place in another State between such persons who are *bona fide* residents of such State and who continue to reside there until the death of the wife, and such marriage is valid in the State where consummated, the husband is entitled to and takes, under the provisions of Section 2295 of the General Statutes of 1906, all the property of the wife situated in this State, where she dies intestate, without leaving any children or their descendants surviving her."

In addition to our constitutional prohibition of marriages between white persons and colored persons, Sections 5857, 5860 C. G. L. not only prohibit such marriages but declare them utterly null and void. Yet, this court, in the case of Whittington v. McCaskill, *supra*, held that where, as in that case, the parties were married in the State of Kansas, where the marriage was entirely valid, the validity of such marriage would not be questioned in this State and the husband would be entitled to inherit all the property of the wife situated in this State, she having died intestate and without children. If in the circumstances set out in the Whittington case the marriage was recognized as valid in this State, we must likewise hold that a bigamous marriage, recognized as valid in West Virginia until annulled by a court decree, is valid here until so annulled, unless we are willing to assert that bigamy is more against the public policy of this State than miscegenation. And this too in spite of the fact that our Constitution denounces miscegenation but does not refer to bigamy and our civil statutes make all marriages between white persons and negroes absolutely void, yet omitting from such statutes any reference to bigamous marriages. It is true, however, that both

bigamy and miscegenation are crimes by our criminal statutes. See Sections 7559, 7662 C. G. L.

The Federal statutes have no bearing on this question except in the District of Columbia and the territories of the United States. The Federal Supreme Court has held that the Constitution of the United States confers no power whatever upon the General Government to regulate marriage, or its dissolution, in the states, nor the duties and obligations which marriage creates, nor its effect upon property rights. Andrews v. Andrews, 188 U. S. 14, 23 S. Ct. 237, 240, 47 L. Ed. 366. But congress saw fit to make bigamy a crime in the territories. Reynolds v. U. S., 98 U. S. 145, 25 L. Ed. 244.

An exhaustive review of the many and somewhat conflicting authorities upon this general subject will be found in the note to Hills v. State, 57 L. R. A. 155, and also in the note to the case of *In re* Chace, 26 R. I. 251, 3 Ann. Cas. 1051, 1054. See also State v. Fenn (Wash.) 92 Pac. 417, 17 L. R. A., N. S., 800, 802, and Lanham v. Lanham (Wis.) 117 N. W. 787, 17 L. R. A., N. S., 804. See also note in 51 A. L. R., page 1412, and 5 R. L. 995.

There seems to be no statute in our state expressly denouncing a bigamous marriage as void. Thus we have no *statutory* public policy to that effect. Indeed, one of the grounds for divorce provided by our statute is: "That either party had a husband or wife living at the time of the marriage sought to be annulled." Section 4983 C. G. L. This would seem to imply that a bigamous marriage, consummated in another state where it is recognized as voidable but not void, and where one of the parties thereto removes to this state, should be deemed valid in this state until annulled either by decree of divorce or a decree in annulment proceedings. This would necessarily result from

the doctrine laid down by this Court in Whittington v. McCaskill, *supra*.

Under the law of West Virginia, therefore, the marriage of the defendant and E. J. Ganz was in legal effect *voidable*, and was regarded as valid until its nullity was declared by a court of competent jurisdiction. Voidable marriages, as distinguished from those that are absolutely void, are generally regarded as valid until annulled by court decree. Tyson v. State, 83 Fla. 7, 90 So. 622. It follows that under the applicable West Virginia law, the defendant was married to E. J. Ganz, under a voidable marriage, until the annulment of the marriage by the final decree of the Circuit Court of Pinellas County on October 30, 1935.

While still married to E. J. Ganz, under the law of West Virginia, which West Virginia marriage must be recognized as valid in this state until annulled by court decree (see Whittington v. McCaskill, *supra*), the defendant, on November 22, 1932, attempted to marry Edward C. Dithrich in Florida by going through a marriage ceremony in this state and later cohabiting with him, which relationship continued until the death of Dithrich on June 19, 1935. Not until after the final decree of October 30, 1935, annulling the Ganz marriage, was the defendant, under the doctrine enunciated by this Court in a recent case, able to contract another marirage in this state. While we have no express statute on the subject, yet in the recent case of Jones v. Jones, 119 Fla. 824, 161 So. 836, it was held that, as to a bigamous marriage consummated in this state, the following doctrine was applicable:

"The marriage of a man and woman, where one of them has a husband or wife by a prior marriage, who is then living and undivorced, is generally held to be absolutely

void, and not merely voidable, and being a nullity, no judicial decree is ordinarily necessary to avoid same."

Thus the intended marriage between the defendant and Edward C. Dithrich in this state, was void, and was so decreed by the chancellor below, and could not have been made valid unless she had continued to live with him as his wife after the final decree had been entered annulling the marriage of the defendant and E. J. Ganz, if indeed by that manner of conduct it could have been validated. Since this became impossible, due to the prior death of Edward C. Dithrich, the defendant never became the wife of Edward C. Dithrich.

It is contended that there was not sufficient proof that the defendant and E. J. Ganz had been married in West Virginia.

The evidence showed that the defendant had lived in a common law marital relation with William Albert Goldman in West Virginia until the latter's death. Common law marriages made in West Virginia not being recognized as valid in that State, Beverlin v. Beverlin, 29 W. Va. 732, 3 S. E. 36; Chapter LXIII, Sec. 6, Code of West Virginia (4th Ed.) 1899, the defendant, after the death of Goldman, procured a marriage license for William A. Goldman, and herself, in order that the common law marriage between the deceased and herself might be recognized as legal, for the purpose, so she claims, of keeping her daughter from learning that she was Goldman's common-law wife, only, but appellees allege that it was done so that she might claim part of his estate as his widow, a common law marriage not being recognized in West Virginia. An attempt was made to alter the date on the marriage license to show a date prior to the death of William Albert Goldman. To accomplish this purpose, E. J. Ganz, the defendant's son-

in-law, went with her to procure the marriage license, and went through the marriage ceremony with her before a minister of the gospel.

. The record shows that this marriage was consummated under a license issued to William A. Goldman and Mary M. Stayer, the defendant, empowering any person authorized to celebrate marriages in West Virginia to unite them in matrimony according to the ceremonies of that authorized person's church or religious denomination and the laws of West Virginia. H. L. Wiggins, as Minister of the Christian Church, made a return on the license stating that he married the parties under authority of that license. The defendant admitted going through the ceremony with E. J. Ganz.

The law of West Virginia controls as to what is necessary to constitute a valid marriage in that State. Since common law marriages are not recognized there, all marriages to be valid must consequently be ceremonial. In the absence of a showing as to what the law of West Virginia required to be done to properly celebrate a marriage, the law of West Virginia is presumed to be the same as that of Florida. See 18 R. C. L. 427, Sec. 55. No showing was made that the law of West Virginia required more to be done than was done by the parties in order to become married. We think the evidence was sufficient to prove that the parties were properly married in ceremonial fashion, under the Florida law, Secs. 5848-5860 C. G. L., which in this case is presumed to be the same as the law of West Virginia.

The fact that E. J. Ganz represented himself to be William Albert Goldman at the time he assisted the defendant in procuring the marriage license and at the time he went through the marriage ceremony with the defendant

before a minister of the gospel, will not vitiate the marriage of the parties, because in so doing no fraud was practiced upon the defendant. See 38 C. J. 1300, 1307.

It is contended by appellees that the defendant entered into the marital relation with E. J. Ganz in order to procure for herself benefits from the Goldman estate, and she is now seeking to deny that the marriage with Ganz was effectively consummated in order to procure for herself benefits from the Dithrich estate. The defendant testified, however, that she went through the marriage with Ganz in this manner so that her daughter would not know that she had been the common law wife of Goldman, and that at the time of the marriage with Ganz she never intended to live with him or become his wife.

"As a general rule the law will not look behind the appearance of a consent which was clearly manifested to determine its reality. Secret mental reservations of a party will not be inquired into, nor will the motives inducing the apparent consent ordinarily be examined." 38 C. J. 1300.

The parties went through a marriage ceremony in West Virginia with every apparent outward intention of becoming lawfully wedded to each other. Whatever mental reservations the defendant may have had at the time were not evidenced by her conduct when the ceremony was performed, and they cannot be considered now.

I think the final decree should be affirmed.