### Johnson et al. v. Sands.

Jan. 24, 1939.

W. J. WARD for appellants.

A. N. CISCO for appellee.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming.

This suit was brought by appellants, who are the heirs at law of A. J. Johnson, deceased, to set aside his marriage to appellee, Mrs. Isabelle Sands (Johnson). A. J. Johnson and Isabelle Sands, both residents of Kentucky, were married in Charleston, West Virginia, April 23, 1928. Johnson died two days after the marriage was consummated, leaving an estate of approximately $15,000. A demurrer to appellants' petition seeking to have the marriage set aside was sustained, and an appeal was brought to this Court. We de-

cided in the case of Johnson v. Sands, 245 Ky. 529, 53 S. W. (2d) 929, that the lower court erred in sustaining the demurrer to the petition because appellants' second ground, namely, the alleged mental incapacity of A. J. Johnson to enter into a marriage contract, stated a cause of action. In that opinion it was assumed, however, that the marriage took place in Kentucky because no reference was made in the pleadings to the place of marriage. Upon the return of the case to the lower court the issues were joined, proof was taken and a final judgment was entered on March 4, 1937. The judgment directed that appellants' petition and all of their pleadings be dismissed, and it was adjudged that the marriage between A. J. Johnson and Isabelle Sands was and is a valid and lawful marriage, and that Isabelle Sands is the legal and lawful widow of A. J. Johnson. From this judgment appellants appeal.

Appellants contend vigorously that A. J. Johnson was in such a mental and physical condition at the time his marriage with Isabelle Sands took place on April 23, 1928, that he was not capable of entering into a marriage contract. We have examined carefully the record which consists of approximately 500 pages of pleading and proof, and have reached the conclusion that the finding of the trial court that the marriage between A. J. Johnson and Isabelle Sands was a valid marriage should not be disturbed. In reaching this conclusion we have given consideration to the applicable West Virginia law, which will be discussed later herein. But we have also reached the conclusion from a study of the evidence, much of which is conflicting, that our decision would have been the same under our Kentucky laws, because we do not think that the proof shows that Johnson's mental condition was such that he could not have entered into a valid marriage contract on April 23, 1928. Where the evidence is conflicting in a suit in equity, and there is doubt as to whether the chancellor erred in his conclusion, it is our rule not to disturb his finding upon a question of fact. Hayes v. Hayes' Ex'r, 181 Ky. 589, 205 S. W. 596; Price v. Meade, 182 Ky. 814, 207 S. W. 695; Alexander v. Lewis, 184 Ky. 679, 212 S. W. 440; Hite's Adm'r v. Hite's Ex'r, 265 Ky. 786, 97 S. W. (2d) 811; Ream v. Fugate, 265 Ky. 463, 97 S. W. (2d) 11; Blackburn's Adm'x v. Union Bank & Trust Co., 269 Ky. 699, 108 S. W. (2d) 806; Perkins v. Jackson, 276 Ky. 217, 123 S. W. (2d) 247.

A. J. Johnson was approximately 62 years of age at the time of his death. He had lived in Prestonsburg, Kentucky, for a number of years, and had been engaged in the coal mining business at that place. A few months before his death he disposed of his business and went to Ashland, Kentucky, to live with his son, W. H. Johnson. Shortly thereafter he met Mrs. Isabelle Sands, a woman in her early forties, and her husband. A friendship developed between these parties, and in a short time A. J. Johnson went to the Sands home to live. Trouble seems to have arisen between Mr. and Mrs. Sands shortly thereafter and she left her home and went to Charleston, West Virginia, where, according to her testimony, she registered at a hotel under the name of Jones. Johnson either accompanied Mrs. Sands to Charleston or went there shortly. There is conflict in the evidence as to whether or not he and Mrs. Sands were registered at the hotel under the names of Mr. and Mrs. Andy Jones for a while. After the parties had been in Charleston a short time they entered into a contract March 3, 1928, under which Johnson agreed to pay Mrs. Sands $5 a day for nursing and attending him. About this time Dr. Rigrish, of Charleston, treated Johnson for rectal trouble. In the latter part of March Johnson's health became worse and Dr. Rigrish was called in again. He stated that Johnson had "asthmatic heart trouble and a general poisoned condition of his system" when he began treating him at that time. Johnson was taken to a hospital where he stayed for several days. Arrangements were made for Mrs. Sands to go to the Halstead boarding house when Johnson went to the hospital. She seems to have gone to the hospital and assisted in caring for Johnson, however, even though he was under the constant attention of a day and a night nurse up until the time of his death April 25, 1928. That he was a sick man and in a weak physical condition is undisputed, but there is competent evidence in the record which indicates that Johnson knew what he was doing, and continued to attend to business, such as paying his bills, up until the time of his death. Dr. Rigrish testified that, when he last saw Johnson, which was prior to the time he was taken to the boarding house, he was in such a condition that in his opinion he (Johnson) was not capable of contracting a marriage or doing any business. When presented with checks which Johnson had written just prior to his

death, and his check book in which entries were made by him, the Doctor stated that it required an intelligent person to write them as they had been written.

Some time around the middle of April Mrs. Sands' husband either committed suicide, or was killed, in Ashland. There is testimony to the effect that, after this event, A. J. Johnson insisted on several occasions that Mrs. Sands marry him. On April 23rd, one of the nurses attending Johnson secured a marriage license and arranged for a preacher to come to the boarding house, at which place the marriage took place around 4:00 p. m. The nurse stated that all this was done at Johnson's request. None of Johnson's relatives were notified of the wedding. Witnesses who were present when the marriage took place testified that Johnson stood alone by Mrs. Sands when the marriage ceremony was being performed. The next day Mrs. Sands (Johnson) went to Ashland, at Johnson's request, so she stated, to see about disposing of a piece of property she owned there. She remained there until after she was notified that Johnson had died at 4 a. m., April 25th.

Johnson moved from an upstairs room to a downstairs front room on April 24th. There is little doubt but that he knew what he was doing that day, and that he walked down the stairs to his new room. Witnesses for appellant stated, however, that he was assisted down the stairs, while one of the nurses said that he walked down the stairs with other persons, but without help. When Johnson reached his new room he sat for a while in a rocking chair by a front window. The testimony of one of the appellants, a brother of A. J. Johnson, as to the change from the upstairs to the downstairs room is as follows:

"Q. How long before his death was the last time you saw him? A. I saw him on Tuesday evening, and he died Wednesday morning.

"Q. Some time Wednesday night? A. I saw him on Tuesday morning, took my outfit and shaved him on Tuesday morning, and then when I went back to my work on Tuesday evening, I stopped in and saw him.

"Q. Do you know anything about him having been brought from upstairs to the downstairs portion of the house? A. Yes, I was right there.

"Q. How did he get down from the upstairs apartment to the lower portion of the house? A. My brother and I assisted him; my brother was on one side, and I was on the other, and when we got him downstairs, he said, 'I want to look through the window' and at that time my nephew had driven up in a car he had just bought, and he wanted Uncle John to see it.''

This same brother, who seems to have arranged originally for a room for A. J. Johnson at the Halstead boarding house, also testified that:

"Q. When you went over there to see him at the hospital, he knew you, didn't he? A. Yes, he knew me.

"Q. When you went to the Halstead rooming house, he knew you, didn't he? A. Yes, sir.

"Q. When you shaved him he knew you, didn't he? A. Yes, sir.

"Q. And he knew his other brother that visited him over at the hotel, didn't he? A. Yes, sir.

"Q. He knew what he was talking about all the time, and what he was doing, didn't he? A. Yes.

"Q. And he also knew where he was, didn't he? A. What little he would say, but he didn't talk very much.

"Q. Of course, he was a sick man, as I understand it? A. Yes, he was a very sick man.''

It is significant that a part of appellants' testimony about the mental incapacity of A. J. Johnson was given by persons who admitted that they had not seen him for some time prior to his death.

While the conduct of Johnson and Mrs. Sands, and especially that of Mrs. Sands, was very questionable, and while there is strong indication that it was not necessary for Johnson to force his attentions upon Mrs. Sands, and, as has been indicated, it is clear that Johnson was a sick man from the latter part of March until the time of his death, it is not for us to determine whether a sick man should get married, or whether the marriage contract was a desirable one for either or both of the parties. We can not escape the conclusion that Johnson knew what he was doing on April 24th. Wit-

nesses for appellee testified positively that Johnson appeared to be happy about his marriage on April 24th, and, as stated, the proof indicates strongly that he was well aware of what was going on that day.

The marriage between A. J. Johnson and Isabelle Sands having taken place in West Virginia, its validity must be determined in terms of the laws of that state. Potter v. Stanley, 187 Ky. 292, 219 S. W. 167; Hopkins County Coal Co. v. Williams, 219 Ky. 156, 292 S. W. 1088; Loughran v. Loughran, 292 U. S. 216, 54 S. Ct. 684, 78 L. Ed. 1219. Section 1, chapter 64, Barnes' West Virginia Code 1923 (now embodied in section 4701 of the West Virginia Code), which was in effect at the time the marriage in question took place, provides:

"All marriages between a white person and a negro; all marriages which are prohibited by law on account of either of the parties having a former wife or husband then living; all marriages which are prohibited by law on account of consanguinity or affinity between the parties; all marriages solemnized when either of the parties was insane, or incapable from physical causes of entering into the marriage state, or under the age of consent, shall, if solemnized within this state, be void from the time they are so declared by a decree of divorce or nullity."

Section 4, chapter 64, Barnes' West Virginia Code 1923 (now section 4702), provides:

"When a marriage is supposed to be void, or any doubt exists as to its validity, for any of the causes mentioned in the first section of this chapter, either party may institute a suit for affirming or annulling the same, and upon hearing the proofs and allegations of the parties, the court shall render a decree affirming or annulling the marriage, according to the right of the case. In every such case, and in every other case where the validity of a marriage is called in question, it shall be presumed that the marriage is valid, unless the contrary be clearly proven."

It has been held frequently under these sections of the West Virginia statutes, and as they have been amended, that certain designated marriages are voidable and not void until declared void by a decree of

divorce or nullity. Stewart v. Vandervort, 34 W. Va. 524, 12 S. E. 736, 12 L. R. A. 50; Perkey v. Perkey, 87 W. Va. 656, 106 S. E. 40; Hall v. Baylous, 109 W. Va. 1, 153 S. E. 293, 69 A. L. R. 527; Martin v. Martin, 54 W. Va. 301, 302, 46 S. E. 120, 1 Ann. Cas. 612; Sledd v. State Compensation Commissioner, 111 W. Va. 509, 163 S. E. 12, 80 A. L. R. 1424; Hastings v. Douglass, D. C., 249 F. 378. See, also, Goldman v. Dithrich, Fla., 179 So. 715. The Douglass Case, which was decided by a Federal District Court in West Virginia, seems to be the only case in which it has been held that a marriage between parties as covered by section 1, chapter 64 of Barnes' West Virginia Code, 1923, can not be avoided after the death of one of the parties to the extent of depriving the other of their property rights. The Sledd Case, however, seems to take a somewhat different view as to whether or not a bigamous marriage could be voided after the death of one of the parties, though it was not necessary for the court to pass upon that question in the Sledd Case.

It has been held in other jurisdictions, however, which have statutory provisions relating to the validity of certain marriages similar to the West Virginia statutes, that the marriage can not be attacked by third parties after the death of one or both of the parties to the marriage. Bruns v. Cope, 182 Ind. 289, 105 N. E. 471; Henderson v. Ressor, 265 Mo. 718, 178 S. W. 175; In re Hollingsworth's Estate, 145 Wash. 509, 261 P. 403; Wiser v. Lockwood's Estate, 42 Vt. 720; Lau v. Lau, 81 N. H. 44, 122 A. 345; Ellis v. Ellis, 152 Miss. 836, 119 So. 304; White v. Williams, 154 Miss. 897, 124 So. 64; In re Gregorson's Estate, 160 Cal. 21, 116 P. 60, L. R. A. 1916C, 697, Ann. Cas. 1912D, 1124; Inhabitants of Goshen v. Richmond, 4 Allen, Mass., 458; State ex rel Setzer v. Setzer, 97 N. C. 252, 1 S. E. 558, 2 Am. St. Rep. 290; Ducasse's Heirs v. Ducasse, 120 La. 731, 45 So. 565.

We see, therefore, that there is grave doubt, notwithstanding the West Virginia Sledd Case, supra, as to whether or not appellants can attack collaterally the marriage between A. J. Johnson and Isabelle Sands, since the marriage under section 1, chapter 64 of Barnes' West Virginia Code, 1923, was voidable and not void and was not attacked before the death of Johnson. But having already reached the conclusion that the trial

court's judgment that the marriage between A. J. Johnson and Isabelle Sands was a valid and legal marriage should be upheld, and that Johnson's mental condition on April 23, 1928, was such that he was capable of entering into a valid marriage contract, it is not necessary for us to attempt a technical interpretation of the West Virginia statutes as to whether a voidable marriage may or may not be attacked by third parties after the death of one of the parties to the marriage.

Judgment affirmed.